[No. S013629. Dec. 31, 1990.]

CITIZENS OF GOLETA VALLEY, Plaintiff and Appellant, v.
BOARD OF SUPERVISORS OF SANTA BARBARA COUNTY et
al., Defendants and Respondents;
WALLOVER, INC., et al., Real Parties in Interest and Respondents.

COUNSEL

Philip A. Seymour for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Theodora Berger, Assistant Attorney General, Ken Alex, Deputy Attorney General, Shute, Mihaly & Weinberger, Mark I. Weinberger, Sonnenschein, Nath & Rosenthal, H. Sinclair Kerr, Jr., Thomas Holden, Daniel P. Selmi, Remy & Thomas, Michael H. Remy, Tina A. Thomas, James G. Moose, Robert H. Thompson, Hall & Phillips, Carlyle W. Hall, Jr., John R. Phillips, Ann E. Carlson and Carl H. Moor as Amici Curiae on behalf of Plaintiff and Appellant.

Marvin Levine, Acting County Counsel, David Nawi, County Counsel, Stephen Shane Stark and Jana Zimmer, Deputy County Counsel, for Defendants and Respondents.

Robert E. Goodwin, Russell R. Ruiz, Burke, Williams & Sorensen, Colin Lennard and Lisa E. Kranitz as Amici Curiae on behalf of Defendants and Respondents.

Hollister & Brace, Richard C. Monk, Gibson, Dunn & Crutcher, Joel S. Moskowitz, Baker & McKenzie, Timothy A. Tosta, J. Frederick Clarke, Jr., Maria C. Pracher, Jonathan S. Kitchen, Judy V. Davidoff, Douglas A. Potts, Matsinger & Blakeboro and Diane M. Matsinger for Real Parties in Interest and Respondents.

Baker & Hostetler, McCutchen Black, Philip K. Verleger, Donna R. Black, Peter Hsiao, Ronald A. Zumbrun, Robin R. Rivett and M. Reed Hopper as Amici Curiae on behalf of Real Parties in Interest and Respondents.

McCutchen, Doyle, Brown & Enersen, Stephen L. Kostka, Daniel J. Curtin, Jr., Michael P. Durkee, Thomas C. Wood and Michael H. Zischke as Amici Curiae.

## OPINION

**ARABIAN, J.**—We granted review in this matter to determine the sufficiency of an environmental impact report (EIR) on the proposed development of a shore-front resort hotel in the County of Santa Barbara (County). Citizens of Goleta Valley (CGV), a coalition of groups opposed to the project, challenged the EIR on the sole ground that it failed to consider a number of purportedly reasonable project alternatives.

For the reasons set forth below, we conclude that the decision of the County Board of Supervisors (Board) to reject the alternatives as infeasible was supported by substantial and tenable evidence, and therefore cannot be classified as an abuse of discretion.

### I. Facts and Procedure

This case is the culmination of a decade-long effort by real parties in interest Wallover, Inc. (Wallover), and Hyatt Corporation (collectively Hyatt) to build a resort hotel on 73 acres of undeveloped oceanfront land in the County. The property, known locally as Haskell's Beach, is part of the 1,143-acre Embarcadero Ranch, owned by real party Wallover. Located approximately eight miles from Santa Barbara on the western edge of the Goleta valley, it is bounded on the north by United States Highway 101 (Highway 101) and the Southern Pacific Railway. To the east is an ARCO oil processing facility and the Sandpiper Golf Course. The Aminoil Dos Pueblos oil field and Ellwood pier (used by ARCO and Exxon for oil-related activities) form the western border. To the south lies the majestic Pacific Ocean.

Although currently vacant, the property has a long history of industrial use. From the 1920's to the 1950's, an oil processing plant and tank farm occupied the site. Thereafter the property was abandoned, although some unesthetic remnants of the former plant, such as old steel pilings, concrete abutments and pipe ends, are still visible. Notwithstanding its industrial past, the property currently contains a number of environmentally sensitive species and habitats. The beach historically was the site of a major Chumash Indian settlement; three recorded Native American cemeteries remain.

In 1980 the County submitted its local coastal program (LCP) to the state coastal commission for approval. The submittal designated Haskell's

Beach as an "urban" area suitable for planned residential development. The commission, however, rejected the County's designation, concluding that the property was more appropriate for new resort/visitor-serving commercial development. The County refused to accept this designation, with the result that Haskell's Beach became a "white hole" in the County's LCP, i.e., an area without any particular land-use designation or development policy, subject to continuing County and coastal commission authority, and tension.

Armed with this knowledge, in 1983 Hyatt filed an application with the County for development of the property as a resort hotel and convention center. An EIR analyzing the project was certified as complete in September 1984 (a supplement and minor addendum to the EIR were certified the same month), and rezoning and LCP amendments designating the land for visitor-serving commercial development were approved. The coastal commission subsequently granted a coastal development permit subject to certain conditions.

The initial project proposal had called for a resort hotel of some 574 units (50 of which were to be located north of Highway 101), related restaurants, a conference center complex, tennis courts, swimming pools, water pipelines and a new access road. The EIR examined 4 development alternatives: no project; clustered high-density residential development; a smaller, 340-unit resort hotel and conference center south of the highway; and the alternative ultimately approved, a 400-unit hotel, with the potential for second-phase development of an additional 100 hotel rooms and 24 villas. There was no in-depth consideration of any alternative location for the project.

The EIR certification and land-use approvals were subsequently set aside in *Citizens of Goleta Valley* v. *Board of Supervisors* (1988) 197 Cal.App.3d 1167 [243 Cal.Rptr. 339] (*Goleta I*) on the ground, inter alia, that "omission from the EIR of consideration of whether there was a feasible alternate site or sites was unreasonable and rendered the EIR inadequate, so as to make the [County's] actions with regard to it a prejudicial abuse of discretion." (*Id.* at p. 1180.) The Court of Appeal remanded the matter to the superior court with directions to issue a mandatory writ.

During the pendency of the appeal in *Goleta I*, the County began preparation of a supplemental EIR to address some of the concerns raised in the first appeal. The draft EIR released in August 1987 contained a brief discussion of Santa Barbara Shores as an alternative site for the project. A staff report by the County's resource management department later explained that the EIR "focused on the Santa Barbara Shores property as a potential

alternative site since it meets certain basic criteria: it is located on the South Coast, is a shore-front property, is planned for a visitor-serving use, and is comparable in size to the Hyatt property. No other property . . . meets all of these specifications."[1]

During the subsequent public-comment period, CGV submitted an extensive critique of the discussion of alternatives in the EIR, demanding a more detailed analysis of Santa Barbara Shores and requesting that "any other feasible alternative sites should be specifically identified and discussed." CGV mentioned only one other specific alternative, an additional Wallover property north of Highway 101.

In response to CGV's comments, the final EIR released in November 1987 contained an expanded discussion of the Santa Barbara Shores property as an alternative location for the project. While noting that the site appeared to be environmentally preferable to Haskell's Beach in certain respects, the EIR found that other environmental impacts, particularly with respect to traffic congestion, air quality and water resources, rendered the property less attractive. For these reasons, as well as the fact that the site was designated primarily for residential rather than visitor-serving commercial development, and that the property was not owned by Hyatt, the EIR rejected Santa Barbara Shores as a preferred alternative.

As to the feasibility of other sites, the final EIR stated in its response to comments: "No other locations have been discussed due to the lack of available oceanfront property suitable for the project." In support of this conclusion, the EIR referred to a December 1985 coastal commission staff report on Hyatt's application for a development permit which stated: "Other areas of the Santa Barbara coast are not able to accommodate the visitor serving development proposed here because of their congestion and the difficulty of developing large scale resorts there." As to the suggested Wallover alternative, the EIR explained: "Sites located inland from the ocean, for example, the remaining Wallover property referenced in this comments [*sic*] have not been addressed since it is felt that oceanfront property is required to meet the basic objectives of this project."[2]

In February 1988, after public hearings, the planning commission certified the final EIR and approved with conditions a final development plan for the 400-unit project. CGV appealed the planning commission decision

---

[1] The land-use designation for Santa Barbara Shores was "Planned Development," a residential use which conditionally permitted commercial recreational facilities.

[2] The final EIR also contained an expanded analysis of on-site alternatives. In addition to the "no project" alternative, the EIR considered scaled-down options of 524, 400, 350, 250 and 200 units.

to the Board. On the eve of the hearings before the Board, CGV submitted a letter indicating its dissatisfaction with the alternatives discussion in the EIR. CGV urged County to consider a number of specific additional sites: Carpinteria Bluffs; More Mesa; West Devereaux; Naples; Dos Pueblos Canyon; El Capitan Ranch; and the Wallover property north of Highway 101.

After further public hearings, the Board filed the EIR, approved Hyatt's final development plan and adopted findings and final conditions for the project. These included approximately 136 conditions designed to mitigate various adverse environmental impacts identified in the EIR. Ten pages of findings also addressed the specific alternatives suggested by CGV after the close of the comment period. The Board concluded that none of the properties in question represented a feasible alternative to the project. None was designated for large-scale visitor-serving commercial development in the County's coastal zone. Indeed, the Board noted that the coastal commission had *withheld* certification of the County's LCP with respect to Haskell's Beach until it agreed to designate the property for visitor-serving commercial development. The Board's findings referred specifically to a 1980 coastal commission report which stated: "Given that the County's [land-use] plan does not adequately provide for new visitor-serving development to meet the growing need, the Commission finds that the Haskell's Beach site is suitable for such a use and is the best location with good access to the beach."

Other reasons cited by the Board for finding CGV's alternatives to be infeasible were as follows: With respect to Carpinteria Bluffs, the Board observed that the area had been annexed by the City of Carpinteria and was no longer within the County's jurisdiction. In addition, the Board adverted to an LCP finding that the site was suitable only for moderate-scale development in the range of 100 to 200 units; an independent market analysis commissioned by the Board in connection with the Hyatt project had concluded that a 400-unit hotel was the smallest scale resort hotel that could be economically viable.

As to More Mesa, the Board noted that the LCP had designated the property for residential rather than commercial resort development. For a variety of reasons, including traffic congestion, isolation from the region's two major tourist destinations and the adverse impact on local recreational uses in the area, the LCP had specifically concluded "that More Mesa would be an *inappropriate location for a major visitor-oriented facility.*"

West Devereaux was also found to be an infeasible alternative based, in part, on the LCP's conclusion that the site "*is inappropriate for a visitor-serving use* because of the oil facility [which occupied a leased portion of the

property], the fragility of the dunes area, and the residential character of the surrounding developments." Moreover, location of a major resort hotel at the site, the Board concluded, would severely impact existing residential development, contrary to coastal zoning policy that "visitor-serving commercial development . . . should not change the character or impact residential areas."

As to the Gaviota Coast alternatives (Naples, Dos Pueblos Canyon and El Capitan Ranch), the Board observed that all were located within the rural zone of the LCP, that the area carried a high seismic rating, and that because of the unavailability of urban services the LCP deemed the area to be inappropriate for commercial development. "Accordingly," the Board concluded, "EIR alternative site analysis of these properties is not required nor reasonable."

In August 1988, following the Board's approval of Hyatt's final development plan, County filed its return to the peremptory writ issued by the trial court pursuant to *Goleta I, supra,* 197 Cal.App.3d 1167. CGV filed objections and a motion to strike the return. After additional briefing and a hearing, the trial court found in favor of Hyatt and discharged the writ of mandate. CGV appealed on the sole ground that the Board had failed to comply with the Court of Appeal's directive concerning alternative sites. The Court of Appeal agreed, holding that the EIR had failed to delineate facts sufficient to explain its rejection of alternative sites other than Santa Barbara Shores, and therefore was still inadequate.

For the reasons which follow, we conclude that the Court of Appeal was in error.

## II. Discussion

### A. *Background*

Our analysis begins with the recognition of certain first principles. This case turns, to a great extent, on the legislative intent underlying the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) and related land-use and development law. Accordingly, we must seek to ascertain and effectuate that intent. (*People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1007 [239 Cal.Rptr. 656, 741 P.2d 154].) Our task in this respect is made decidedly easier by prior case law. ■ As we recently observed in *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*): "The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest

possible protection to the environment within the reasonable scope of the statutory language.' " (*Id.* at p. 390, quoting *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].)

The EIR has been aptly described as the "heart of CEQA." (Guidelines, § 15003, subd. (a);[3] *Laurel Heights, supra,* 47 Cal.3d at p. 392; *County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377].) Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made. Thus, the EIR "protects not only the environment but also informed self-government." (*Laurel Heights, supra,* 47 Cal.3d at p. 392.)

In reviewing agency actions under CEQA, Public Resources Code section 21168.5 provides that a court's inquiry "shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." Thus, the reviewing court " 'does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document.' " (*Laurel Heights, supra,* 47 Cal.3d at p. 392, quoting *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [108 Cal.Rptr. 377].) We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. "Our limited function is consistent with the principle that 'The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.' " (47 Cal.3d at p. 393, quoting *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 [118 Cal.Rptr. 249, 529 P.2d 1017].) We may not, in sum, substitute our judgment for that of the people and their local representatives. We can and must, however, scrupulously enforce all legislatively mandated CEQA requirements.

## B. *Project Alternatives*

The core of an EIR is the mitigation and alternatives sections. The Legislature has declared it the policy of the State to "consider alternatives to

---

[3] All references to Guidelines are to the state CEQA Guidelines, which implement the provisions of CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.) The Guidelines state: "These Guidelines are binding on all public agencies in California." (Guidelines, § 15000.) Although this court has not decided the issue of whether the Guidelines are regulatory mandates or merely aids to interpretation, we have indicated that, "[a]t a minimum, . . . courts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights, supra,* 47 Cal.3d at p. 391, fn. 2.)

proposed actions affecting the environment." (Pub. Resources Code, § 21001, subd. (g); *Laurel Heights, supra,* 47 Cal.3d at p. 400.) Section 21002.1, subdivision (a) of the Public Resources Code provides: "The purpose of an environmental impact report is to identify the significant effects of a project on the environment, *to identify alternatives to the project,* and to indicate the manner in which those significant effects can be mitigated or avoided." (Italics added. See also Pub. Resources Code, § 21061 ["The purpose of an environmental impact report is . . . to list ways in which the significant effects of such a project might be minimized; *and to indicate alternatives to such a project."* (Italics added.)].)

In determining the nature and scope of alternatives to be examined in an EIR, the Legislature has decreed that local agencies shall be guided by the doctrine of "feasibility." "[I]t is the policy of the state that public agencies should not approve projects as proposed if there are *feasible alternatives* or *feasible mitigation measures* available which would substantially lessen the significant environmental effects of such projects . . . . [I]n the event specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more significant effects thereof." (Pub. Resources Code, § 21002, italics added.)

The Legislature has defined "feasible," for purposes of CEQA review, as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (Pub. Resources Code, § 21061.1; Guidelines, § 15364; *Laurel Heights, supra,* 47 Cal.3d at p. 402, fn. 10; *Foundation for San Francisco's Architectural Heritage* v. *City and County of San Francisco* (1980) 106 Cal.App.3d 893, 910 [165 Cal.Rptr. 401].) Both the California and the federal courts have further declared that "[t]he statutory requirements for consideration of alternatives must be judged against a rule of reason." (*Foundation for San Francisco's Architectural Heritage* v. *City and County of San Francisco, supra,* 106 Cal.App.3d at p. 910; *Village of Laguna Beach* v. *Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1028-1029 [185 Cal.Rptr. 41]; *Vermont Yankee Nuclear Power Corp.* v. *NRDC* (1978) 435 U.S. 519, 551 [55 L.Ed.2d 460, 484, 98 S.Ct. 1197]; *Coalition for Canyon Preservation* v. *Bowers* (9th Cir. 1980) 632 F.2d 774, 783.)[4] As we have explained, "One of [an EIR's] major functions . . . is to ensure that *all reasonable alternatives* to proposed projects are thoroughly assessed by the responsible official." (*Wildlife Alive*

---

[4] Recognizing that CEQA was modeled on the National Environmental Policy Act (NEPA) (42 U.S.C. § 4321 et seq.), "we have consistently treated judicial and administrative interpretation of the latter enactment as persuasive authority in interpreting CEQA." (*Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 201 [132 Cal.Rptr. 377, 553 P.2d 537].)

v. *Chickering, supra,* 18 Cal.3d at p. 197, italics added; accord *Laurel Heights, supra,* 47 Cal.3d at p. 400; *Bowman* v. *City of Petaluma* (1986) 185 Cal.App.3d 1065, 1083-1085 [230 Cal.Rptr. 413].)

These statutory and judicial concepts are carried forward in the Guidelines, which state that an EIR must "[d]escribe a range of reasonable *alternatives to the project, or to the location of the project,* which could feasibly attain the basic objectives of the project, and evaluate the comparative merits of the alternatives." (Guidelines, § 15126, subd. (d), italics added.) As the underscored language suggests, project alternatives typically fall into one of two categories: on-site alternatives, which generally consist of different uses of the land under consideration; and off-site alternatives, which usually involve similar uses at different locations. (See, e.g., *Laurel Heights, supra,* 47 Cal.3d at pp. 403-407; *Residents Ad Hoc Stadium Com.* v. *Board of Trustees* (1979) 89 Cal.App.3d 274, 286-288 [152 Cal.Rptr. 585].)

CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose. Informed by that purpose, we here reaffirm the principle that an EIR for any project subject to CEQA review must consider a reasonable range of alternatives to the project, *or to the location of the project,* which: (1) offer substantial environmental advantages over the project proposal (Pub. Resources Code, § 21002); and (2) may be "feasibly accomplished in a successful manner" considering the economic, environmental, social and technological factors involved. (Pub. Resources Code, § 21061.1; Guidelines, § 15364; *Goleta I, supra,* 197 Cal.App.3d 1167.)

C. *Adequacy of the Hyatt EIR*

With this standard in mind, we turn to the question of whether the Hyatt EIR addressed a legally adequate range of alternatives. As noted earlier, the original EIR considered 4 alternatives to the original 574-unit project proposal: high density residential development; 2 reduced scale resort hotels of 524 and 340 units; and the no-project alternative. The supplemental EIR expanded this discussion with a consideration of 4 additional reduced-scale alternatives (200, 250, 350 and 400 rooms) as well as 1 off-site alternative, Santa Barbara Shores.

CGV does not assert that the foregoing assessment was deficient as such. Rather, it contends the EIR was inadequate because it failed to review in depth those additional sites which CGV proffered to the Board after expiration of the comment period. We find the contention to be unpersuasive. The record evidence substantially supports the Board's conclusion that none of

the additional sites represented a feasible project alternative or merited extended discussion in the EIR. Consequently, we cannot classify the Board's decision to issue the final EIR as an abuse of discretion.

### 1. *Timeliness*

■ Before explaining the facts and reasoning which impel us to this conclusion, however, we must dispose of two preliminary issues. First, Hyatt contends that the alternative sites which CGV asserts should have been discussed in the EIR were not brought to the Board's attention in a timely fashion and therefore did not merit consideration. The contention lacks merit.

Public Resources Code section 21003.1, subdivision (a) provides that public comments on the environmental effects of a project "shall be made to lead agencies *as soon as possible* in the review of environmental documents . . . in order to allow the lead agency to identify, at the earliest possible time in the environmental review process, potential significant effects of a project, alternatives, and mitigation measures which would substantially reduce the effects." (Italics added; see also Guidelines, §§ 15087, 15088, 15207.) The lead agency, in turn, is required to evaluate and respond to any significant environmental questions presented. (*Browning-Ferris Industries* v. *City Council* (1986) 181 Cal.App.3d 852, 862 [226 Cal.Rptr. 575]; Guidelines, § 15088, subd. (a).) There is no requirement that a lead agency respond in writing to comments submitted after expiration of the comment period. (*Ibid.*, see also *City of Poway* v. *City of San Diego* (1984) 155 Cal.App.3d 1037, 1043-1044 [202 Cal.Rptr. 366].)

Hyatt points out that CGV did not raise the six alternative sites during the statutory comment period for the original EIR in 1984, or during the comment periods for any of the subsequent supplemental EIR's. In 1985, more than one year after expiration of the comment period for the 1984 EIR, CGV wrote to the Board complaining that the EIR had failed "to discuss alternative sites." In 1987, CGV called for a more extensive discussion of the Santa Barbara Shores alternative in the draft supplemental EIR, but did not specify additional properties other than the Wallover site north of Highway 101. Months later, after certification of the supplemental EIR and within days of the first hearing on its appeal to the Board, CGV first raised the six new sites and demanded yet another supplemental EIR to assess their potential as feasible project alternatives.

Hyatt implies that CGV deliberately rationed its objections to the successive EIR's, reserving mention of the specific alternatives until the last possible moment, in order to frustrate and defeat the project.

We cannot, of course, overemphasize our disapproval of the tactic of withholding objections, which could have been raised earlier in the environmental review process, solely for the purpose of obstruction and delay. As one federal court has aptly stated: "[T]he NEPA requirement of studying alternatives may not be turned into a game to be played by persons who—for whatever reasons and with whatever depth of conviction—are chiefly interested in scuttling a particular project." (*Seacoast Anti-Pollution* v. *Nuclear Regulatory Com'n* (1st Cir. 1979) 598 F.2d 1221, 1230-1231.)

Nevertheless, we recognize that the duty of identifying and evaluating potentially feasible project alternatives lies with the proponent and the lead agency, not the public. As we observed in *Laurel Heights, supra,* "Nowhere in CEQA . . . is there a provision that this duty is conditional on a project opponent coming forward with a documented alternative." (47 Cal.3d at p. 406.) Thus, CGV's failure to raise the specific alternatives during the comment period would not necessarily have warranted a decision to exclude the sites altogether from consideration, particularly if they had appeared to represent reasonable project alternatives. As discussed in the section which follows, however, the timing issue does bear on the reasonableness of the Board's decision to address the alternative sites by means of administrative findings, rather than by commissioning yet another supplemental EIR.

### 2. *The Administrative Record*

As explained in the final discussion section[5] CGV contends the Board lacked a substantial evidentiary basis to support its findings that the six sites suggested by CGV were not feasible alternatives. First, however, CGV raises a procedural point: Whatever the substantive merits of the Board's reasoning, the analysis was flawed because its findings, although part of the administrative record, were not contained in the EIR itself.

As we have frequently observed, it is only the EIR that can effectively disclose to the public the "analytic route the . . . agency traveled from evidence to action." (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12]; *Laurel Heights, supra,* 47 Cal.3d at p. 404.) In general "the EIR must contain facts and analysis, not just the agency's bare conclusions or opinions." (*Concerned Citizens of Costa Mesa, Inc.* v. *32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 935 [231 Cal.Rptr. 748, 727 P.2d 1029]; *Laurel Heights, supra,* 47 Cal.3d at pp. 404-405.) Thus, in *Laurel Heights* we declared an EIR to be defective which simply concluded, without more, that certain ostensibly reasonable alternative sites for the location of

---

[5] Part C.3., *post*, at pages 570-575.

biomedical research facilities were infeasible. (47 Cal.3d at pp. 403-405.) In that case, the EIR contained no meaningful analysis of any alternatives whatsoever; under the circumstances, we were unwilling to take on "blind trust" the Regents' promise that certain alternatives had in fact been considered and found to be infeasible. (*Id.* at p. 404.)

■ Our decisions do not indicate, however, that the administrative record shall play no role, under any circumstances, in evaluating the adequacy of an EIR. As noted earlier, an EIR must discuss and analyze *feasible* alternatives. The local agency, therefore, must make an initial determination as to which alternatives are feasible and merit in-depth consideration, and which do not. (*Com. of Ky.* ex rel. *Beshear* v. *Alexander* (6th Cir. 1981) 655 F.2d 714, 718.) In California, this screening process is known as "scoping." (See Guidelines, § 15083, subd. (a) ["Scoping has been helpful to agencies in identifying the range of actions, alternatives, mitigation measures, and significant effects to be analyzed in depth in an EIR and in eliminating from detailed study issues found not to be important."].)

In general, an EIR should set forth the alternatives that were considered by the lead agency and rejected as infeasible during the scoping process, and the reasons underlying the agency's determination. (*Laurel Heights*, *supra*, 47 Cal.3d at pp. 404-405.) However, the administrative record may be studied "to assess the degree of discussion any particular alternative deserves, based on the alternative's feasibility and the stage in the decisionmaking process it is brought to the attention of the agency." (*Grazing Fields Farm* v. *Goldschmidt* (1st Cir. 1980) 626 F.2d 1068, 1074.) To be sure, agency consideration of otherwise reasonable alternatives in the administrative record cannot replace the CEQA mandated discussion of alternatives in the EIR. (*Laurel Heights*, *supra*, 47 Cal.3d at pp. 403-404; *Grazing Fields Farm* v. *Goldschmidt*, *supra*, 626 F.2d at pp. 1073-1074.) "But where potential alternatives are not discussed in detail in the [EIR] because they are not feasible, the evidence of infeasibility need not be found within the [EIR] itself. Rather a court may look at the administrative record as a whole to see whether an alternative deserved greater attention in the [EIR]." (*Com. of Ky.* ex rel. *Beshear* v. *Alexander*, *supra*, 655 F.2d at p. 719; accord *Citizens Comm. Against Interstate Rt. 675* v. *Lewis* (S.D.Ohio 1982) 542 F.Supp. 496, 540.)

Thus, where the circumstances warrant, a reviewing court may consult the administrative record to assess the sufficiency of the range of alternatives discussed in an EIR. The circumstances justify such consultation here. Unlike the EIR in *Laurel Heights*, *supra*, 47 Cal.3d 376, County's environmental review of the Hyatt project discussed a full range of alternatives, including an in-depth discussion of one off-site alternative. Moreover, CGV

raised the issue well after the comment period had expired. Thus, the Board's decision to delineate its reasons for rejecting the CGV sites as feasible alternatives by means of administrative findings, rather than a full-blown supplemental EIR, cannot be deemed in this case to have been erroneous.

### 3. *Adequacy of the Alternatives Analysis*

We turn to CGV's central contention that the Board erred in rejecting the additional properties (More Mesa, Carpinteria Bluffs, West Devereaux, Naples, Dos Pueblos Canyon, El Capitan Ranch) as feasible project alternatives. CGV asserts that the Board's decision was based upon the following invalid criteria: (1) that the sites had land-use designations in the LCP which were inconsistent with the development of a major commercial resort-hotel; (2) that none of the sites was owned by Hyatt; and (3) that one of the sites lay outside of the County's jurisdiction. We find CGV's contentions to be unpersuasive.

 As noted earlier, the "rule of reason" can and must be understood only with reference to the statutory purpose. CGV's assertions rest on a fundamentally flawed conception of the function and purpose of an EIR. According to CGV, the primary goal of the Hyatt EIR was, or should have been, to identify and review alternative sites throughout the region which could physically accommodate a major new resort hotel, regardless of whether the alternatives could feasibly be developed by the project proponent, or even necessarily approved by the lead agency. CGV contemplates, in essence, an EIR dedicated to broad-based regional planning, identifying optimum locations for new resort/visitor-serving commercial development in light of a variety of pertinent planning and environmental factors.

These are indisputably important concerns. But CGV fails to recognize that the law provides for their consideration *elsewhere*. The Legislature has mandated that every county and city must adopt a "comprehensive, long-term general plan for the physical development of the county or city, and of any land outside its boundaries which in the planning agency's judgment bears relation to its planning." (Gov. Code, § 65300.) The general plan has been aptly described as the "constitution for all future developments" within the city or county. (*O'Loane* v. *O'Rourke* (1965) 231 Cal.App.2d 774, 782 [42 Cal.Rptr. 283]; *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 997 [165 Cal.Rptr. 514]; *deBottari* v. *City Council* (1985) 171 Cal.App.3d 1204, 1212-1213 [217 Cal.Rptr. 790].) "[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements." (*Resource Defense Fund* v. *County of Santa Cruz* (1982) 133 Cal.App.3d 800,

806 [184 Cal.Rptr. 371].) To be sure, the general plan is not immutable, far from it. But it may not be trifled with lightly, as the limitation on the number of amendments to the general plan in any calendar year attests. (Gov. Code, § 65361; *deBottari* v. *City Council, supra,* 171 Cal.App.3d at p. 1213.)

Like the general plan, the LCP strives to ensure planned, comprehensive development within the coastal zone, with a view to preserving—where feasible—the "overall quality of the coastal zone environment and its natural and artificial resources." (Pub. Resources Code, § 30001.5.) Under the coastal act, each local government must prepare and adopt land-use policies for that portion of the coastal zone within its jurisdiction. (Pub. Resources Code, § 30500, subd. (a).) After its adoption, the LCP becomes a part of the local government's general plan and is vested with the same "constitutional" authority. (Pub. Resources Code, §§ 30003, 30108.55, 30500.)

Regional planning and environmental review play an integral role in the development and adoption of both the general plan and the LCP. (Gov. Code, §§ 65030, 65302; Pub. Resources Code, §§ 30001, 30001.5, 30002, 30502, 30530.) Land-use, circulation, housing, conservation, erosion and other mandatory elements address the location and distribution of land for business, industry, agriculture, recreation, open space, enjoyment of scenic beauty and other uses. (Gov. Code, § 65302.) The land-use element of the LCP must, in addition, specifically consider issues concerning public access to and along the coast, and coastal-dependent and related development. (Pub. Resources Code, § 30001.5.)

By their very nature, both the general plan and the LCP embody fundamental policy decisions that guide future growth and development. Local governments must confront, evaluate and resolve competing environmental, social and economic interests. The planning process necessarily compels cities and counties to consider *alternative* land-use goals, policies and implementation measures. As explained in the Office of Planning and Research, General Plan Guidelines: "A general plan must address the issues associated with a jurisdiction's physical development. Such issues concern the general locations, appropriate mixtures, timing and extent of land uses and supporting infrastructure. They pertain to the physical nature of a jurisdiction's environment. The broad scope of physical development issues ranges from appropriate areas for building factories to open space for preserving scenic vistas."

The process, moreover, is structured to transcend the provincial. Public participation and hearings are required at every stage, in order to obtain an array of viewpoints. (Pub. Resources Code, § 30503; Gov. Code, §§ 65351,

65355.) Furthermore, each county LCP must be submitted to the state coastal commission for approval, thus ensuring not only a local but a regional and state perspective, as well. (Pub. Resources Code, §§ 30512, 30512.1.)

The law also requires that planning efforts remain current. Local agencies must periodically review and revise their general plans as circumstances warrant; housing elements must be revised no less than every five years. (Gov. Code, §§ 65103, subd. (a), 65588, subd. (b).) LCP's must be reviewed by the coastal commission at least once every five years. (Pub. Resources Code, § 30519.5.) Amendments must undergo the same rigorous public scrutiny as the original documents. (Pub. Resources Code, §§ 30501, 30514; Gov. Code, §§ 65353, 65354, 65356, 65358.)

In short, the County's general plan and local coastal program address the very issues which CGV claims should have been addressed in the Hyatt EIR. Identification and analysis of suitable alternative sites for the development of new hotels and resorts in the County's coastal zone was precisely the task of the LCP. A review of that document amply justifies the County's reliance on its findings and conclusions in assessing the feasibility of alternative sites.

Following extensive public review and hearings, the County's LCP was approved by the Board and certified by the State in 1981. The 235-page document, complete with graphs, maps and appendices, exhaustively analyzed all of the land and resources lying within the County's coastal zone. From a myriad of environmental, social and economic perspectives—sensitive plant and wildlife habitats, flood and seismic hazards, erosion, scenic values, traffic patterns, as well as overall agricultural, industrial and recreational needs—the LCP considered suitable land uses for each of the alternative sites proffered by CGV. The LCP's analysis and conclusions fully support the Board's findings, referred to earlier,[6] that none of the sites in question was appropriate for a major resort/visitor-serving commercial development.

Informed and enlightened regional planning did *not* demand a project EIR dedicated to defining optimal alternative sites without regard to feasibility. Indeed, such ad hoc reconsideration of basic planning policy was not only unnecessary, but would have been in contravention of the legislative goal of long-term, *comprehensive* planning. As earlier noted, the keystone of regional planning is consistency—between the general plan, its internal elements, subordinate ordinances, and all derivative land-use decisions.

---

[6] The Board's findings are summarized, *ante*, at pages 562-563.

(*Resource Defense Fund* v. *County of Santa Cruz, supra,* 133 Cal.App.3d at p. 806; *deBottari* v. *City Council, supra,* 171 Cal.App.3d at pp. 1210-1213.) Case-by-case reconsideration of regional land-use policies, in the context of a project-specific EIR, is the very antithesis of that goal.

This is *not* to say that EIR analysis must proceed with regional blinders. The local agency need not, indeed it *may* not, ignore regional needs and cumulative impacts. (*Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 [118 Cal.Rptr. 249, 529 P.2d 1017]; Guidelines, §§ 15125, 15206 [118 Cal.Rptr. 249, 529 P.2d 1017].) Had the LCP here, for example, identified alternative sites as environmentally suitable for a major resort-hotel project, the EIR could properly have noted that fact, and the reasons which underlay the LCP's conclusion.

Conversely, an EIR may properly consider an *inconsistent* land-use designation in the general plan or coastal element in assessing the feasibility of a project alternative. (Guidelines, § 15125, subd. (b) ["The EIR shall discuss any inconsistencies between the proposed project and applicable general plans and regional plans."].) To be sure, the mere fact that an alternative may require a legislative enactment does not necessarily justify its exclusion from the EIR (see *Methow Valley Citizens Council* v. *Regional Forester* (9th Cir. 1987) 833 F.2d 810, 815; *City of Angoon* v. *Hodel* (9th Cir. 1986) 803 F.2d 1016, 1021-1022); it may not be appropriate, for example, to disregard an otherwise reasonable alternative which requires some form of implementing legislation (*Residents Ad Hoc Stadium Com.* v. *Board of Trustees, supra,* 89 Cal.App.3d at pp. 286-287) such as a zoning amendment or conditional-use permit. Moreover, in some circumstances, an EIR may consider alternatives requiring a site-specific amendment of the general plan. However, an EIR is not ordinarily an occasion for the reconsideration or overhaul of fundamental land-use policy.

The EIR here considered a full range of project alternatives, including at least one reasonable off-site alternative. The LCP had characterized the project site as the most suitable location for the proposed development, and had further concluded, after an exhaustive regional and environmental survey, that no other property (with the singular exception of the one alternative site analyzed in the EIR) was appropriate for the land use under consideration. Under these circumstances, where the County has already undertaken a study of the environmental suitability of alternative sites for commercial development and has embodied its findings in the LCP, we cannot say that the Board abused its discretion in relying on the LCP to help it assess the feasibility of potential project alternatives.

CGV's remaining objections to the LCP may be easily disposed of. They argue that the County should have been required to demonstrate that,

as the Court of Appeal stated, the conclusions in the LCP still "relate to current conditions." The argument overlooks the fact that general and coastal plans must be updated periodically. (Gov. Code, § 65103; Pub. Resources Code, § 30519.5.) To require a reexamination of basic land-use policy with every permit application would impose an unnecessary and wasteful burden on local governments.

■■■ CGV also asserts that the County could not legitimately characterize certain alternatives as infeasible, based in part upon inconsistent land-use designations, when the project site itself, Haskell's Beach, required LCP and zoning amendments prior to development. As noted in the Board's findings, however, the critical distinction is that Haskell's Beach constituted a "white hole" in the LCP; although the coastal commission considered it to be the best location for future resort development, the site had not received a resort/visitor-serving designation because of an earlier, inconsistent recommendation by the County.

Finally, CGV argues that the Board improperly considered that Hyatt did not own any of the alternative sites, and that one of the sites, Carpinteria Bluffs, lay outside of the County's jurisdiction. We disagree. As earlier noted, a project alternative which cannot be feasibly accomplished need not be extensively considered. A feasible alternative is one which can be "accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (Pub. Resources Code, § 21061.1; Guidelines, § 15364.) Surely whether a property is owned or can reasonably be acquired by the project proponent has a strong bearing on the likelihood of a project's ultimate cost and the chances for an expeditious and "successful accomplishment."

■■■ This is not to suggest that private projects are categorically exempt from alternative-site review. Understandably, the government's power of eminent domain and access to public lands suggest that alternative sites may be more feasible, more often, when the developer is a public rather than a private agency. (See, e.g., *Laurel Heights, supra,* 47 Cal.3d at pp. 403-404 [EIR defective which failed to consider whether state university either owned or could acquire alternative sites for location of biomedical research facilities]; *Residents Ad Hoc Stadium Com.* v. *Board of Trustees, supra,* 89 Cal.App.3d at p. 288 [EIR properly considered alternative sites on public university campus for the construction of an athletic stadium]; *Natural Resources Defense Council* v. *Callaway* (2d Cir. 1975) 524 F.2d 79, 92-93 [environmental impact statement for naval dump site must consider alternative sites]; *Porter Cty. Chapter of Izaak Walton League* v. *A.E.C.* (7th Cir. 1976) 533 F.2d 1011, 1017 [public utility must consider alternative sites for

location of nuclear power plant]; see generally *Horn* v. *Intern. Business Machines Corp.* (1985) 110 A.D.2d 87 [493 N.Y.S.2d 184, 190-191].)

 Nevertheless, there may be cases involving proposed development by a private entity in which the consideration of alternative sites is necessary and proper. The private developer may own or control feasible alternative sites, may have the ability to purchase or lease such properties, or may otherwise have access to suitable alternatives. (See, e.g., *San Bernardino Valley Audubon Society, Inc.* v. *County of San Bernardino* (1984) 155 Cal.App.3d 738, 751 [202 Cal.Rptr. 423] [EIR found to be defective which mentioned but failed to discuss possibility of land trade between private developer and United States Forest Service to preserve sensitive habitats]; *Methow Valley Citizens Council* v. *Regional Forester, supra,* 833 F.2d at pp. 815-816 [environmental impact statement review of private developer's application to construct ski resort within national forest must consider alternative sites].) In-depth analysis of alternative sites may also be appropriate where two or more private developers are seeking the approval of a local agency for the same type of development at different locations. (*Horn* v. *Intern. Business Machines Corp., supra,* 493 N.Y.S.2d at p. 191.) Other circumstances may necessitate review of alternative properties, as well.

Thus, we conclude the Board did not abuse its discretion in simply considering whether the project proponent owned or had reasonable access to alternative sites in assessing their feasibility. Nor did the Board err in noting that one of the alternatives, Carpinteria Bluffs, lay outside of the County's planning jurisdiction. Again, we emphasize that an EIR may not ignore the regional impacts of a project proposal, including those impacts that occur outside of its borders; on the contrary, a regional perspective is required. (*Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d at p. 283; Guidelines, §§ 15125, 15206.) But the law does not require indepth review of alternatives which cannot be realistically considered and successfully accomplished; the County could properly find that a property located outside of its decision making authority was not a feasible project alternative.[7]

---

[7] We emphasize that, as with site ownership, jurisdictional borders are simply a factor to be taken into account and do not establish an ironclad limit on the scope of reasonable alternatives. Our holding is necessarily limited to the facts before us; here, it is clear that the Board did not reject Carpinteria Bluffs solely because it was no longer within the County's planning jurisdiction; the LCP had also shown that the site was not feasible because it had soil erosion problems, and could not accommodate more than a 100- to 200-unit hotel, a capacity which an economic analysis had shown to be less than economically viable. We also recognize that many large-scale projects may call for the approval of one or more local agencies; we do not mean to suggest that the only discussion of alternatives required in an EIR would be those relating to the particular decisions that each local agency is empowered to take.

## CONCLUSION

Our discussion and holding in this matter are designed to illustrate, not exhaust, the circumstances where a review of off-site alternatives to a private project may be feasible; as we have stated, there is no ironclad rule governing the nature or scope of the alternatives to be discussed in an EIR, other than the rule of reason. The wisdom of approving this or any other development project, a delicate task which requires a balancing of interests, is necessarily left to the sound discretion of the local officials and their constituents who are responsible for such decisions. The law as we interpret and apply it simply requires that those decisions be informed, and therefore balanced. Concurrently, we caution that rules regulating the protection of the environment must not be subverted into an instrument for the oppression and delay of social, economic, or recreational development and advancement.

## DISPOSITION

For the foregoing reasons, the judgment of the Court of Appeal is reversed.

Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., Eagleson, J., and Kennard, J., concurred.