[No. A056311. First Dist., Div. Four. Nov. 4, 1992.]

SIERRA CLUB et al., Plaintiffs and Appellants, v.
CONTRA COSTA COUNTY et al., Defendants and Respondents;
CHARTERED LAND AND CATTLE COMPANY et al., Real Parties in
Interest.

**[Opinion certified for partial publication.†]**

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 2 and 3.

## COUNSEL

Dickson & Ross, Kathryn Burkett Dickson and Jeffrey A. Ross for Plaintiffs and Appellants.

Victor J. Westman, County Counsel, and Silvano Marchesi, Assistant County Counsel, for Defendants and Respondents.

McCutchen, Doyle, Brown & Enersen, Daniel J. Curtin, Jr., Maria P. Rivera, Gagen, McCoy, McMahon & Armstrong, Mark L. Armstrong and Patricia E. Curtin for Real Parties in Interest.

OPINION

POCHÉ, J.—Plaintiffs Sierra Club, Mount Diablo Audubon Society, and Greenbelt Alliance appeal from a judgment denying them a writ of mandate in either of two consolidated actions. Plaintiff organizations challenged defendant Contra Costa County's (County) approval of a specific plan for development of the Bethel Island area of the Sacramento River delta and the County's certification of a final environmental impact report (EIR), as well as additional County actions taken in an effort to comply with the California Environmental Quality Act (CEQA). The California State Lands Commission also sought a writ of mandate for essentially the same purpose. The matters were consolidated and eventually both petitions denied. Only plaintiff environmental organizations appeal from that judgment. Real parties in interest are owners and prospective developers of property within the confines of the specific plan area.

In 1986 County began working on an update of its general plan. About a year later the County undertook studies preparatory to a specific plan for the Bethel Island area which includes approximately 6,500 acres. Geographically the area encompassed by the plan consists of Bethel Island (roughly 3,500 acres) to the north and adjoining it on the south, the Hotchkiss Tract. While both portions are at or below sea level and protected from inundation by levees, of the two, the island soils are more loosely compacted and some 1,500 of its acres have been described as actual or potential wetlands.

"After the legislative body has adopted a general plan, the planning agency may, or if so directed by the legislative body, shall, prepare specific plans for the systematic implementation of the general plan for all or part of the area covered by the general plan." (Gov. Code, § 65450.) The specific plan must specify in detail the types of land uses which will be permitted, as well as defining proposed transportation facilities, water supplies, sewage and solid waste disposal. (Gov. Code, § 65451, subds. (a)(1) and (a)(2).) It must also set forth the "standards and criteria by which development will proceed" and a program for implementing through regulation, public works projects and financing measures for the needs it identifies. (Gov. Code, § 65451, subds. (a)(3) and (a)(4).)

The initial draft of the Bethel Island Specific Plan would have allowed a total of 4,000 new units of residential housing, of which 2,400 would have been on the island proper. The draft EIR for the specific plan found that because of its geology the island itself was extremely susceptible to soil liquefaction in the event of a serious earthquake which might also cause collapse of the island's levees.

A revised draft specific plan was proposed in June 1989. That plan reduced the total of new residential units to 3,000 of which only 1,000 would be on the island. A new draft EIR was issued in October 1989. This draft EIR concluded that 11-25 percent of the planning area consisted of wetlands, but it concluded that the significant impact of development on the wetlands could be reduced by mitigation measures. It also found risks from earthquake to be an unavoidable adverse impact.

On July 10, 1990, the County Board of Supervisors (Board) adopted a revised specific plan which permits development off island of no more than 3,000 residential units, and on island of "886 already approved units . . . as well as one unit per existing vacant parcel" (or approximately 200 units). It also includes a "no net loss of wetlands" policy which would be achieved by requiring one-to-one replacement of insignificant wetlands and three-to-one replacement of wetlands deemed to be of significant value. On the same date the Board certified the final EIR.

Subsequently plaintiff environmental groups and the State Lands Commission each filed a petition for a writ of mandate. After consolidation of the two petitions, hearings were conducted in June 1991.

The court issued a memorandum of decision on October 17, 1991, in which it made the following ruling: "4) Although in some respects the alternatives proposed in the EIR are deficient, the Board of Supervisors did scale down the plan from that proposed by the local planning group. The Board recognized the concern for wetlands. It limited new housing units on island to those already approved and one unit per parcel. [¶] However, CEQA mandates that alternatives focus on reducing or avoiding environmental impacts. Other than 'no project,' there is no analysis of anything less than 3,000 houses. The County should delineate a better range of environment alternatives. It can do this by administrative findings rather than another EIR. (*Citizens of Goleta Valley* vs. *Board of Supervisors* (1990) 52 C3d 553 [276 Cal.Rptr. 410, 801 P.2d 1161]." The final paragraph of the eight-page document reads "Petition for Writ is denied with the exception that the County should administratively make further findings on alternatives."

On November 5, 1991, the Board adopted a two-page document entitled "Supplemental Statement of Findings on Project Alternatives for the Bethel Island Area Specific Plan." On December 3, 1991, the trial court issued its judgment discharging the alternative writ and entering judgment in favor of defendant County and the real parties in interest, having found the "Environmental Impact Report and the Specific Plan" to be "legally adequate in

all respects, and the Board of Supervisors having adopted administrative findings as directed in the Court's Memorandum of Decision."

## *Discussion*

On appeal plaintiff environmental groups contend that the trial court erred when it permitted the County to make additional findings to remedy the defects the court found in the EIR's discussion of alternative projects. They argue that the error requires us to reverse and remand to the trial court with directions to it to issue the writ.

One of the basic purposes of CEQA is to "[p]revent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible." (Cal.Code Regs., tit. 14 § 15002, subd. (a)(3); see also Pub. Resources Code, § 21002.)[1] In furtherance of this goal the regulatory scheme requires an EIR to set out "a range of reasonable alternatives to the project," including the "specific alternative of 'no project.'" (Guidelines, § 15126, subds. (d) and (d)(2).)

The goal of this exercise is to create an informative document which reveals what choices were considered by the public officials and which demonstrates to the citizenry how those choices were made. (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426, 764 P.2d 278].) For that reason "[t]he core of an EIR is the mitigation and alternatives sections." (*Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161].)

In support of their petition plaintiffs argued that the EIR contained an inadequate discussion of alternatives in that it created a straw man project for 2,500 units designed so as to have greater environmental impact than the larger project contained in the specific plan. The EIR analyzed only 2 alternatives for less development than the 3,000 residential units called for by the specific plan and analyzed only 3 alternatives for larger projects— 4,000, 5,500 and 9,000 units respectively.

One of the smaller projects called for only 2,500 new residential units— 1,500 units on island and 1,000 units off island. Although this plan reduced the total number of new houses to be built, it put an additional 500 houses on the more seismically sensitive island than on the less sensitive off island

---

[1]The administrative regulations applicable to CEQA are called Guidelines. (Guidelines, § 15001.) Guideline sections and their numbers are identical to the sections and their numbers of title 14 of the California Code of Regulations.

plot. Likewise the alternative could be said to be more damaging to wetlands since most of the wetlands were on island. Plaintiffs argued to the trial court that this 2,500 unit alternative was intentionally designed to be more environmentally harmful than the specific plan's proposal calling for 3,000 units—only 1,000 of which would be on island—and requiring no net loss of wetlands. Thus the EIR found the 2,500-unit alternative to have more environmental impact than the larger specific plan project both as to seismicity and as to biological resources.

Guidelines section 15126, subdivision (d)(3) provides that "[t]he discussion of alternatives shall focus on alternatives capable of eliminating any significant adverse environmental effects or reducing them to a level of insignificance, even if these alternatives would impede to some degree the attainment of the project objectives, or would be more costly."

The EIR did also consider a no-project alternative which would have allowed construction of "977 new units (planned, or approved, but not yet constructed)." Despite the benefit that fewer residents would be exposed to the risks of earthquake, the EIR found, however, that the no-project alternative would not generate revenue to pay for better levees.

Plaintiffs thus urged the trial court to conclude that the EIR's range of alternatives that set up only a no-project alternative as having less environmental impact was not a fair attempt at setting out "alternatives capable of eliminating any significant adverse environmental effects." (Guidelines, § 15126, subd. (d)(3).)

It was against this background that the trial court issued its memorandum of decision finding the alternatives proposed in the EIR to be "deficient" and recommended the Board make new findings.

### 1. *Remand to County*

 On appeal plaintiffs advance a two-pronged argument against the procedure adopted by the trial court. As an initial matter they point to the clear statutory language of Public Resources Code section 21168.9, subdivision (a) which directs a court which finds a public agency has failed to act in compliance with CEQA to issue a writ of mandate.[2] They argue that issuance of a writ rather than a directive to make new administrative findings was the

---

[2]The section provides in pertinent part:

"(a) If a court finds, as a result of a trial, hearing, or remand from an appellate court, that any determination, finding, or decision of a public agency has been made without compliance with this division, the court shall enter an order that includes one or more of the following:

proper procedure. Moreover, they argue that the trial court's remand effectively denied them an opportunity to challenge the adequacy of the new findings which the Board adopted at the court's direction.

The trial court remanded for new findings, citing *Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 52 Cal.3d 553. That case involved the development of a beachside resort hotel complex. An EIR for the project was challenged for failing to consider whether the hotel could be located on a feasible alternative site or sites. Finding that there had been no serious consideration in the EIR of an alternative site, the Court of Appeal concluded the EIR was inadequate. (*Citizens of Goleta Valley* v. *Board of Supervisors* (1988) 197 Cal.App.3d 1167, 1180 [243 Cal.Rptr. 339].) (*Goleta I.*)

A redrafted EIR which examined one alternative site for the project was in its final stages of approval when opponents of the project asked for a study of six other alternate sites. These alternative sites were rejected by the county board of supervisors, which did so not in a supplemental EIR but by way of administrative findings issued in conjunction with its approval of the final development plan and filing of the final EIR. (*Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 52 Cal.3d at p. 562 [hereafter *Goleta II*].) When the trial court found this second EIR to have complied with the decision in *Goleta I* it discharged the writ of mandate. The Court of Appeal reversed, and the project's opponents appealed to the Supreme Court. (*Goleta II, supra,* 52 Cal.3d at p. 563.)

On that appeal the project's opponents specifically challenged the board's procedure of making findings about the infeasibility of the six alternative sites without issuing a supplemental EIR. Justice Arabian writing for a unanimous court concluded that it was not erroneous for the board to set out its conclusion that the six alternate sites were infeasible by way of administrative findings. (*Goleta II, supra,* 52 Cal.3d at p. 570.) Acknowledging

"(1) A mandate that the determination, finding, or decision be voided by the public agency.

"(2) A mandate that the public agency and any real parties in interest suspend all activity, pursuant to the determination, finding or decision, that could result in any change or alteration to the physical environment, until the public agency has taken such actions as may be necessary to bring the determination, finding, or decision into compliance with this division.

"(3) A mandate that the public agency take specific action as may be necessary to bring the determination, finding, or decision into compliance with this division.

"(b) Any order pursuant to this subdivision (a) shall be made by the issuance of a peremptory writ of mandate specifying what action by the public agency is necessary to comply with this division. The trial court shall retain jurisdiction over the public agency's proceedings by way of a return to the peremptory writ until the court has determined that the public agency has complied with this division.

"(c) Nothing in this section authorizes a court to direct any public agency to exercise its discretion in any particular way. . . ."

that infeasible alternatives must be described in the EIR, he noted, however, that CEQA permits an initial determination of which alternatives are feasible—a process called scoping. (Guidelines, § 15083, subd. (a).) "Thus, where the circumstances warrant, a reviewing court may consult the administrative record to assess the sufficiency of the range of alternatives discussed in an EIR. . . . The . . . County's environmental review of the . . . project discussed a full range of alternatives, including an in-depth discussion of one off-site alternative." (*Goleta II, supra,* at p. 569.)

One of the peculiarities of *Goleta II* was the extensive planning history of the site which began long before even the first EIR. "The [local coastal program] had characterized the project site as the most suitable location for the proposed development, and had further concluded, after an exhaustive regional and environmental survey, that no other property (with the singular exception of the one alternative site analyzed in the EIR) was appropriate for the land use under consideration." (*Goleta II, supra,* 52 Cal.3d at p. 573.) Against this factual background, it made good sense to permit administrative findings on the issue of infeasibility.

In short, in *Goleta II,* the Supreme Court upheld the ruling of the trial court that the EIR contained an adequate discussion of alternatives. It did so in part by referring to the administrative findings adopted in conjunction with the board's filing of the final EIR, not as here with findings adopted only after the adequacy of the EIR was being challenged in court.

Instead, we have a case which is analogous to *Resource Defense Fund* v. *Local Agency Formation Com.* (1987) 191 Cal.App.3d 886 [236 Cal.Rptr. 794]. In *Resource Defense Fund,* plaintiffs challenged the adequacy of an annexation action on CEQA grounds by petitioning for a writ of administrative mandamus. (*Id.* at pp. 890, 899.) The trial court found that the city had failed to comply with CEQA because the EIR did not include findings explaining why the city had rejected the alternative of partial annexation. (*Id.* at p. 899.) In order to permit the city to correct this omission the trial court entered an interlocutory judgment remanding the matter to the city council for it to make the necessary findings and ordering judgment be entered once the council acted at the end of 60 days. Once the city council adopted findings on partial annexation the trial court denied the writ. (*Ibid.*)

Our colleagues in Division One rejected this procedure, concluding that Code of Civil Procedure section 1094.5 does not permit remand before the writ issues, but instead specifies that the writ shall issue and the reviewing

court may then remand. (Code Civ. Proc., § 1094.5, subd. (f); *Resource Defense Fund* v. *Local Agency Formation Com.*, *supra*, 191 Cal.App.3d at p. 899; but see *Rapid Transit Advocates, Inc.* v. *Southern Cal. Rapid Transit Dist.* (1986) 185 Cal.App.3d 996 [230 Cal.Rptr. 225] [permitting remand during a pending administrative mandamus action for clarification of findings].)

Moreover, this sequence of events, issuing a writ where CEQA had not been complied with and then remanding to the agency, is that expressly set forth in Public Resources Code section 21168.9.

The vice of prejudgment remand, as *Resource Defense Fund* points out, is that it "raises serious questions of due process: it effectively preclude[s] any possible challenge to the sufficiency of the evidence to support the new findings. . . . [H]ad the [trial] court granted the writ of mandate compelling the city council to prepare new findings, plaintiffs would have been entitled to challenge those findings at that level and thereafter to litigate any claim of insufficiency of those findings." (*Resource Defense Fund* v. *Local Agency Formation Com.*, *supra*, 191 Cal.App.3d at p. 900.)

In the case before us the trial court did not proceed by way of interlocutory judgment and remand, but instead issued a tentative decision directing adoption of additional findings. The Board made findings by which it concluded that any project substantially smaller than that called for in the specific plan was economically infeasible. "Given the significant public improvements required under the Specific Plan, the infrastructure and off-site costs per unit would be unreasonably high if the number of off-island units were significantly reduced below the approved number. Moreover, it would be difficult to create meaningful recreational communities with the appropriate amenities if the number of units were significantly reduced below the approved number." By making the findings that smaller projects were infeasible the Board justified the EIR's lack of discussion of smaller projects.

Once those two pages of supplementary findings were made the trial court apparently concluded that they were sufficient to cure the defects in the EIR's discussion of alternatives. The result of that procedure has been effectively to insulate those findings from any meaningful challenge. Moreover, unlike *Goleta II* the questioned findings here do not rely upon a comprehensive planning document like the local coastal program which had already explored many of the same issues raised in the EIR process. (*Goleta II*, *supra*, 52 Cal.3d at p. 571.) Indeed, comprehensive regional planning was the very function of the specific plan for which this EIR was prepared.

Accordingly, we find that once the trial court concluded there were defects in the EIR's range of alternatives it erred by not issuing the writ of mandate and remanding the EIR to the Board.

2., 3.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### 4. *Statement of Overriding Considerations*

■ A statement of overriding considerations reflects the final stage in the decisionmaking process by the public body. A public agency can approve a project with significant environmental impacts only if it finds such effects can be mitigated or concludes that unavoidable impacts are acceptable because of overriding concerns. (Pub. Resources Code, § 21081; Guidelines, §§ 15091 and 15092.) If approval of the project will result in significant environmental effects which "are not at least substantially mitigated, the agency shall state in writing the specific reasons to support its action based on the final EIR and/or other information in the record." (Guidelines, § 15093, subd. (b).) These reasons constitute the statement of overriding considerations which is intended to demonstrate the balance struck by the body in weighing the "benefits of a proposed project against its unavoidable environmental risks." (Guidelines, § 15093, subds. (a) and (c).)

"Whereas the [mitigation and feasibility] findings . . . typically focus on the feasibility of specific proposed alternatives and mitigation measures, the statement of overriding considerations focuses on the larger, more general reasons for approving the project, such as the need to create new jobs, provide housing, generate taxes, and the like." (Remy et al., Guide to the California Environmental Quality Act (6th ed. 1992) p. 147.)

The County adopted a three-page statement of overriding considerations which addressed twelve ways in which the benefits of the project outweighed its impacts. These benefits included additional mixed housing of reasonable cost, generation of new tax revenues, improvements to infrastructure including the levees, and additional jobs and recreational opportunities arising from new development.

Plaintiffs contend that this statement of overriding considerations is defective in that it must be, but is not, supported by substantial evidence in the record, and that absent such support the decision approving the project must be remanded to the County.

---

*See footnote, *ante*, page 1212.

At the outset the parties disagree over whether a statement of overriding considerations must be supported by substantial evidence. The County insists that because the statement represents a policy decision—a quasi-legislative choice—it need not be supported by substantial evidence. Plaintiffs urge us to make explicit what has simply been assumed in prior published opinions—namely that a statement of overriding considerations must be supported by substantial evidence.

Guidelines section 15093 which describes the statement of overriding considerations was enacted in response to two cases from this District which held that such balancing statements were required. (*San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584, 596 [122 Cal.Rptr. 100]; *City of Carmel-By-The-Sea* v. *Board of Supervisors* (1977) 71 Cal.App.3d 84, 94-96 [139 Cal.Rptr. 214].) Guidelines section 15093 codified the requirement for a statement of overriding considerations, as it has come to be known, which was mandated by the *Ecology Center* and *Carmel* cases. What the Guidelines section does not state is whether the statement must be supported by substantial evidence. However, beginning with *Ecology Center*, in every case in which a challenge has been made to the statement of overriding considerations, the substantial evidence standard has been used. (See *San Francisco Ecology Center* v. *City and County of San Francisco*, *supra*, 48 Cal.App.3d at p. 596 [statement "must be sustained if supported by substantial evidence"]; *No Oil, Inc.* v. *City of Los Angeles* (1987) 196 Cal.App.3d 223, 238-239 [242 Cal.Rptr. 37]; *Towards Responsibility in Planning* v. *City Council* (1988) 200 Cal.App.3d 671, 683-684 [246 Cal.Rptr. 317].)

The County's argument that such a statement represents a policy decision rather than a factfinding decision finds support in the language of the Guidelines. In lieu of the term "findings" used in the section devoted to mitigation and feasibility (Guidelines, § 15091) in describing the statement of overriding considerations the regulation refers to "specific reasons." (Guidelines, § 15093, subd. (b).) Nonetheless, the Legislature has required that substantial evidence support CEQA findings, regardless of whether those findings are quasi-adjudicative or quasi-legislative. (Pub. Resources Code, § 21081.5; Guidelines, § 15091 and discussion.) Accordingly, we find that a statement of overriding considerations must be supported by substantial evidence contained in "the final EIR and/or other information in the record." (Guidelines, § 15093, subd. (b).)

Plaintiffs attack, in particular, portions of the statement which claim that the specific plan establishes a "requirement for an effective jobs/housing balance for any new residential development." Elsewhere the statement

asserts that "[f]or the first time, new development is required to demonstrate that it will help achieve an effective and meaningful jobs/housing balance." Plaintiffs' assertion that no such requirement is contained in the specific plan is unchallenged by the County, except insofar as it contends that the jobs/housing balance referred to is a regional rather than a local balance. In support of this claim the County relies on additional statistics for the bay area as a whole (citing to a projection by the Association of Bay Area Governments) for the years 1989-2005. These statistics also appear in the statement of overriding considerations. However, the "ABAG" projections are also not part of the record.

In short, there are significant assertions set forth in the statement of overriding considerations which could support the policy choice made by the County. Unfortunately, these assertions are unsupported by the final EIR or other information in the record.

The County argues that even if there is a defect in the statement of overriding considerations it is not prejudicial and therefore does not require remand. As the County notes, Public Resources Code section 21005 provides that a reviewing court shall not presume prejudice from error. Nonetheless that section also provides that "noncompliance . . . with substantive requirements . . . may constitute a prejudicial abuse of discretion . . . regardless of whether a different outcome would have resulted if the public agency had complied with those provisions." Here assertions central to at least three of the twelve areas addressed by the statement are lacking evidentiary support in the record. Insofar as the statement provides a written account of the balancing process undertaken by the County it is substantively infirm.

### 5. *Attorney Fees*

■ Plaintiffs ask that we award them attorney fees under Code of Civil Procedure section 1021.5 which permits such an award for "the enforcement of an important right affecting the public interest if: (a) a significant benefit, either pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate. . . ." Because the plaintiffs have prevailed on two of their claims we find that an award under that section would be appropriate.

### *Disposition*

We reverse the judgment and remand the cause to the trial court which shall: (1) issue a writ of mandate vacating the Board's certification of the

EIR and approval of the Bethel Island Area Specific Plan, and (2) determine the amount of the attorney fees which shall be awarded to plaintiffs for their efforts in this action. Pursuant to Public Resources Code section 21168.9, subdivision (b) the trial court shall retain jurisdiction over this action until the Board certifies an EIR in accordance with CEQA standards and procedures, and one which meets the substantive requirements of CEQA.

Anderson, P. J., and Perley, J., concurred.