Filed 3/25/21  P. v. Schmidt CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>MIKHAIL SCHMIDT,<br><br>  Defendant and Appellant. | D076806<br><br><br>(Super. Ct. No. SCN370653) |

APPEAL from a judgment of the Superior Court of San Diego County, Harry M. Elias, Judge.  Affirmed and remanded with directions.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters and Julie L. Garland, Assistant Attorneys General, Charles C. Ragland and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Mikhail Schmidt with one count of murder (Pen. Code,[1] § 187, subd. (a)) and found true special circumstance allegations that

---

[1]    Undesignated statutory references are to the Penal Code.

Schmidt intentionally killed the victim by means of lying in wait (§ 190.2, subd. (a)(15)), and further that he personally used a knife in the commission of the murder (§ 12022, subd. (b)(1)). Following a bifurcated sanity phase, the jury found Schmidt was sane when he committed the murder. The court sentenced Schmidt to life in prison without the possibility of parole plus one year for the knife use enhancement, in addition to a restitution fine and a suspended $10,000 parole revocation fine under section 1202.45. Schmidt contends his conviction and the jury's special circumstance finding must be reversed due to prejudicial instructional errors regarding mental impairment and voluntary intoxication. He contends that if we do not reverse his conviction and the special circumstance finding, we should strike the parole revocation fine because he was sentenced to life without the possibility of parole. The People concede the latter point, and we agree the court must strike that fine. Otherwise, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Evidence*

In 2017, victim J.B.'s coworker found J.B. stabbed to death outside the construction-site trailer where they were staying. Responding police found blood stains inside the trailer and a trail of blood leading away from it. Pathologists determined J.B.'s blood alcohol content was 0.29 percent at the time of his death.

The next day, Schmidt admitted to killing J.B. to his employer M.H., who was also a personal friend. That day, M.H. noticed something "off" about Schmidt, and overheard Schmidt on his phone saying he should not be talking without a lawyer. M.H. suspected Schmidt had been drinking and Schmidt admitted it. Schmidt initially told M.H. he was on the phone with someone investigating him for war crimes, and talked about his experience in

2

the military killing people. Schmidt also claimed to be working for an organization called "Agent Orange," which gave him instructions to hurt others. Schmidt then admitted he had killed J.B., going into "graphic detail" about the interaction and killing. M.H. had heard about the previous night's murder and prodded Schmidt for information. Schmidt said he had been "looking for trouble" and trying to find someone "alone and vulnerable." Schmidt told M.H. he saw J.B., who seemed drunk, and followed him back to the construction site and into the trailer. Schmidt threw a paint brush inside to see if it would startle or wake anyone up, then when nothing happened, proceeded to stab J.B. in the ear and also in the kidney specifically to stop him from screaming. When M.H. pressed Schmidt about the conflict between his Agent Orange story and his description of how he encountered J.B., Schmidt said, "Would you believe me if I told you that everything about the Agent Orange was . . . total bullshit?" When M.H. said yes, Schmidt admitted it was "totally random"; that he found and followed J.B. M.H. asked Schmidt to go for a walk outside together, but beforehand told his wife to lock the store doors and call police, who eventually arrested Schmidt.

Following his arrest, police interviewed Schmidt. He initially denied killing the victim and telling M.H. about it, but eventually gave officers a detailed account of his actions before and during the crime, consistent with what he told M.H.[2] Schmidt explained: "It was random. It really was. Uh, there was no rhyme or reason behind why I chose him. Um, lately I've been just like tasting blood, like I needed that thrill again. I did. And last night, I don't know where it came from. I honestly, I don't know what came over me.

---

[2]    The jury viewed Schmidt's videotaped interview, which he gave after police read him his *Miranda* rights. (*Miranda v. Arizona* (1966) 384 U.S. 436.)

Um, so yeah, I went. I left my house with that intention to do harm."
Schmidt told officers he "crept into the fucking trailer and that was that,
boom. . . . I knew there was blood on the way out. But damn, I did not think
about the phone GPS. I did not, I wiped my whole fucking car down with
Lysol last night, except for the fucking outside. I mean I, I played, I played
this whole thing out in my head so many fucking times, of how to, how to do
it. And my biggest fault is that I needed to let someone know, so I told
[M.H.]. That was my biggest fault. That was my downfall, that I needed
recognition for, and I have completely ruined everything I had, just off of one
night of fucking just pain." A blood sample taken from Schmidt at the
conclusion of his police interview was determined to have an alcohol content
of 0.092 percent.

*Defense Evidence*

At trial, Schmidt presented a neurologist expert who testified he
suffered from brain abnormalities consistent with PTSD, as well as psychotic
and mood disorders. He presented a psychiatrist expert who opined Schmidt
had experienced some form of trance, loss of consciousness, seizure, "highly
altered mental state" or altered consciousness.[3] However, the expert
explained that alcohol would suppress seizures and allow an addicted person
to function better: "Alcohol suppresses seizures. Alcohol withdrawal causes
seizures. And typically you have to be highly dependent on alcohol—highly
dependent meaning you wake up in the morning and your neurologic system
doesn't work; you can't coordinate until you have another drink, and then you
can move your hands and legs in a coordinated fashion. That's when people
are addicted to alcohol."

---

[3]     Schmidt and the People presented expert evidence in the sanity phase
of trial, which is not at issue on appeal.

4

Schmidt testified in his defense that he became a daily drinker by 2014, and sought help. He relapsed into consistently drinking alcohol in 2017. According to Schmidt, he committed the killing during a five-hour black-out period after Agent Orange, a counterterrorism government agency, "activated" or hired him through "nanobot" controllers that were injected into his brain. He remembered seeing the victim, identifying him as a target that the agency wanted him to eliminate, and following him through the construction site gate. He recalled stabbing the victim once in the ear and twice in the kidney. After the killing, Schmidt remembered cleaning his knife. He testified he saw these things from a "bird's eye view." The next morning he thought it was a dream, but then realized it was not after finding his clothes in the dryer and seeing yellow tape at the construction site. At that time, panic set in and he bought a bottle of alcohol. Schmidt denied telling the truth to police when he said he was feeling the need to taste blood or had the urge to kill, but he could not explain why he made those statements to police.

*Rebuttal*

In rebuttal, the People presented a clinical psychologist who testified that Schmidt exhibited traits of grandiosity, glib superficial charm, a need for stimulation, and pathological lying, for which he scored the highest on her tests. She opined that Schmidt was manipulative and not particularly impulsive, but his actions were "planned out and calculated" in that he considered the pros and cons before doing things. The prosecution also presented Schmidt's Marine Corps commanding officer who rebutted a number of things.

The trial court gave the jury the following instruction regarding voluntary intoxication based on CALCRIM No. 625: "You may consider

5

evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider the evidence only in deciding whether the defendant acted with an intent to kill, the defendant acted with deliberation and premeditation, or the defendant was unconscious when he acted. A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willing to [*sic*] assume the risk of that effect. You may not consider evidence of voluntary intoxication for any other purpose."

The trial court also instructed the jury with a modified version of CALCRIM No. 3428 as follows: "You have heard evidence that the defendant may have suffered from a mental disease or defect or disorder. You may consider this evidence only for the limited purpose of deciding whether at the time of the charged crime the defendant acted with the intent or mental state required for that crime. The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically malice aforethought. If the People have not met this burden, you must find the defendant not guilty of murder. The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically: intent to kill, as it relates to the special circumstance of lying in wait. If the People have not met this burden, you must find the defendant not guilty of the special circumstance or murder by means of lying in wait."

Defense counsel did not object to the giving of these instructions, nor did he raise any issue or objection about them during the jury instruction conference.

6

DISCUSSION

## I. *Instructional Error Claims*

Schmidt raises two claims of instructional error.  He first contends the modified version of CALCRIM No. 3428 read to the jury regarding mental impairment erroneously failed to provide that the evidence of mental disease, defect, or disorder applied not only to malice aforethought, but also to the elements of premeditation and deliberation.  He additionally contends the version of CALCRIM No. 625 given to the jury regarding voluntary intoxication erroneously failed to instruct jurors they could consider the evidence of his voluntary intoxication in evaluating the accuracy and reliability of the statements he made during his post-arrest police interrogation.  Schmidt maintains that based on the evidence and the prosecutor's closing argument, the instructional errors were prejudicial and his conviction should be reversed.

## A. *Forfeiture*

Schmidt's counsel did not object to either instruction given, nor did he ask for clarification, amplification or further modification to encompass the additional issues mentioned above.  Given the omission, the People respond that Schmidt forfeited the instructional errors.  The People argue that the sole inquiry is whether the claim of error affected Schmidt's substantial rights under section 1259, which they equate with asking whether the instruction resulted in a miscarriage of justice.  They argue it is not reasonably likely that Schmidt would have received a different outcome had his counsel sought amplification of the instructions.

We agree with the People in part, that is, we agree the claims are forfeited, but there is no need to assess the instructions' impact on Schmidt's substantial rights.  In *People v. Buenrostro* (2018) 6 Cal.5th 367, the

7

California Supreme Court suggested a limit on section 1259's application in addressing the Attorney General's claim of forfeiture, explaining: "In general, a defendant may raise for the first time on appeal instructional error affecting his or her substantial rights. [Citation.] *But* '[a] party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial.' " (*Id.* at p. 428, italics added; see also *People v. Covarrubias* (2016) 1 Cal.5th 838, 901, 906, 911, 913 [holding forfeiture rule applies to failure to request clarifying or amplifying language to an incomplete instruction without applying section 1259]; *People v. Jackson* (2016) 1 Cal.5th 269, 336 [same]; *People v. Williams* (2015) 61 Cal.4th 1244, 1286; but see *People v. Townsel* (2016) 63 Cal.4th 25, 59-60 [invoking section 1259 to review defendant's claim that predecessor jury instruction to CALCRIM No. 3428 was incomplete without identifying premeditation and deliberation as mental states]; *People v. Rodgers* (2006) 39 Cal.4th 826, 881, fn. 28 [same].) In *Buenrostro*, the defendant claimed that the challenged instruction improperly permitted the jury to find her guilty based on evidence of motive alone. (*Buenrostro*, 6 Cal.5th at p. 428.) The high court held the claim was forfeited because, "at bottom, it is an argument that the instruction was incomplete" and thus the "[d]efendant was obligated to request a clarifying instruction [but] failed to do so, thereby forfeiting her appellate challenge." (*Ibid.*) The defendant made additional claims that other instructions were incorrect. (*Ibid.*) As to those claims, the California Supreme Court held they were reviewable despite the lack of an objection below. (*Ibid.*)

Thus, while courts will not find a forfeiture when a defendant claims the court gave a jury instruction incorrect in law (*People v. Buenrostro*, *supra*,

6 Cal.5th at p. 428; *People v. Gomez* (2018) 6 Cal.5th 243, 312), this is not the claim Schmidt makes here. As to the voluntary intoxication instruction, Schmidt admits the jury in his case "was properly told the voluntary intoxication evidence applied to the elements of intent to kill, premeditation, and deliberation . . . ."[4] His claim is that the jury should have been instructed that the evidence *also* was relevant to its evaluation of his truthfulness or the reliability of his statements to police. With respect to the mental impairment instruction, Schmidt's claim is likewise that it should have additionally encompassed premeditation and deliberation, not just intent to kill or malice aforethought.

Schmidt argues forfeiture is not applicable to his challenges because the error fell within the trial court's sua sponte duty to correctly instruct the jury on general principles of the law or elements of the offense. But here, the trial court gave otherwise correct instructions. The cases Schmidt cites, including *People v. Montoya* (1994) 7 Cal.4th 1027, 1047 ["a trial court must instruct on general principles of law that are commonly or closely and openly connected with the facts before the court and that are necessary for the jury's understanding of the case"] and *People v. Hillhouse* (2002) 27 Cal.4th 469, 503 [the trial court has a sua sponte duty to correctly instruct on all elements of the charged offenses] predate *Buenrostro* and do not convince us that the forfeiture rule is inapplicable here. In *People v. Chavez* (2018) 22 Cal.App.5th 663, this court addressed a defendant's claim of error in failing to instruct the jury fully on self-defense, specifically, by failing to include bracketed language within the instruction pertaining to an aggressor's right to use self-defense when he initially uses nondeadly force, but the opponent

---

4    This court has held that CALCRIM No. 625 is a correct statement of the law. (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1381.)

counters with deadly force. (*Id*. at p. 692.) *Chavez* did not address forfeiture or waiver, and it involved the alleged failure to instruct on a theory of the case, implicating the court's sua sponte obligation. *Chavez* does not prevent us from concluding that forfeiture applies to Schmidt's claim here that otherwise correct jury instructions were incomplete.

We need not further discuss the issue, because even if we were to address the merits of Schmidt's claims, we would reject them.

B. *CALCRIM No. 3428*

There is no merit to Schmidt's challenge to the court's failure to modify CALCRIM No 3428 sua sponte. We assess independently whether instructions correctly state the law (*People v. Posey* (2004) 32 Cal.4th 193, 218), considering the instructions as a whole as we must. (*People v. Tate* (2010) 49 Cal.4th 635, 696.) As to prejudice, we review under the *Watson* (*People v. Watson* (1956) 46 Cal.2d 818) harmless error standard claims of " ' " 'incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error . . . .' " [Citations.] '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' [Citation.] [¶] . . . [¶] Further, the *Watson* test for harmless error 'focuses not on what a reasonable jury could do, but what such a jury is likely to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956; see *People v. Watt* (2014) 229

10

Cal.App.4th 1215, 1219-1220 [*Watson* standard applies to instructional error by failing to instruct or giving an erroneous instruction].)

The court correctly instructed the jury with the pattern version of CALCRIM No. 3428 that evidence of mental disorder could be considered "for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or mental state required for that crime." The court additionally separately defined first degree murder for the jury with CALCRIM No. 521,[5] which included instructions regarding premeditation and deliberation for purposes of one of the theories advanced by the People for first degree murder: "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with

---

[5] The court instructed the jury: "The defendant has been prosecuted for first degree murder as charged in Count 1 under two theories: First, that the murder was willful, deliberate, and premeditated; and, second, that the murder was committed by lying in wait. Each theory of first degree murder has different requirements, so I will instruct you on both. [¶] You may not find the defendant guilty of first degree murder unless all of you agree that the People have proved the defendant committed murder as defined as first degree. You need not all agree as to the same theory. So let me define for you deliberation and premeditation." The court then read CALCRIM No. 521 more fully on premeditation and deliberation as follows: "The defendant is guilty of first-degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the act that caused death. [¶] The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, and without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time."

premeditation.  The defendant acted willfully if he intended to kill.  The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill.  The defendant acted with premeditation if he decided to kill before completing the act that caused death."  Read together, these instructions gave the jury the ability to assess the mental disorder evidence on the issue of whether Schmidt premeditated or deliberated.  " ' "[T]he fact that the necessary elements of a jury charge are to be found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial."  [Citation.] "The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." ' " (*People v. Bolin* (1998) 18 Cal.4th 297, 328; see also *People v. Sanchez* (2001) 26 Cal.4th 834, 852 [jurors are presumed able to "understand and correlate" instructions and to have followed the court's instructions].)

This was the conclusion of the California Supreme Court in *People v. Townsel* (2016) 63 Cal.4th 25 and *People v. Rogers, supra,* 39 Cal.4th 826, in which the defendants advanced similar claims as Schmidt does here: that the court erred by failing to identify premeditation and deliberation when instructing with CALJIC No. 3.32, the predecessor instruction to CALCRIM No. 3428.  (*People v. Townsel*, at pp. 58-59; *People v. Rogers*, at p. 880.)  In *Townsel*, the court instructed the jury with CALJIC No. 3.32 on how it could apply evidence of mental defect or disorder to the charges before it, which included murder, dissuading a witness, and witness-killing as a special circumstance.  As Schmidt does here, the defendant in *Townsel* contended that the instruction given, directing the jurors to consider that evidence "solely" in determining whether the defendant " 'actually formed the mental state which is an element of . . . murder' " (*Townsel*, at  p. 59), limited the

12

jury's consideration to malice aforethought, precluding its consideration of the evidence on the question of premeditation and deliberation. The Supreme Court—applying *People v. Rogers*, 39 Cal.4th 826—rejected this position and found the instruction sufficient with respect to premeditation and deliberation, explaining that once the jury found malice, it was directed to make the further finding of premeditation and deliberation, which undisputedly was a mental state. (*Townsel*, at pp. 62-63.) In *Rogers*, the defendant, who was found guilty of first degree murder with a multiple murder special circumstance, argued the trial court should have specified premeditation and deliberation as mental states to which his mental health evidence was relevant. (*Ibid*.) The *Rogers* court rejected the argument: "We previously have rejected claims that a trial court erroneously failed to identify premeditation and deliberation as a mental state to which evidence of mental disease or defect was relevant, in cases where the trial court either explained that premeditation and deliberation were mental states necessary for a conviction of first degree murder [citations] or instructed that ' "the mental state required is included in the definition of the crime charged" ' [citation]. We also have rejected a similar claim regarding the instruction relating voluntary intoxication to mental state. [Citation.] In the foregoing cases, in light of full instructions defining first degree murder including an explanation of premeditation and deliberation, we concluded 'a reasonable jury would have understood that the requisite mental states (as set forth in the definitions of the crimes) were the same "mental states" that could be considered in connection with the evidence of defendant's mental disease, defect, or disorder.' " (*Id*. at p. 881.)

In reply, Schmidt distinguishes *People v. Rogers* on grounds the court there instructed the jury it could consider mental impairment on "whether or

13

not the defendant actually formed the mental state which is an element of the crimes charged in the information" (*People v. Rogers*, *supra*, 39 Cal.4th at p. 880), but here, the court specified "intent to kill" and "malice aforethought" as the mental states to which the evidence was relevant. But the instruction in this case did tell the jury that it could consider the mental impairment evidence for the purpose of deciding "whether, at the time of the charged crime, the defendant acted with the intent or mental state required for that crime." Schmidt's effort to distinguish *Rogers* is not persuasive, and like the court there, we likewise presume the jurors associated the "intent or mental state" required for "the charged crime" with the mental elements of first degree murder, including premeditation and deliberation, which the court had already defined pursuant to CALCRIM No. 521.

In sum, we see no likelihood that the jury, considering CALCRIM No. 3428 in the context of the entire body of instructions on first degree murder, would have misunderstood the instruction as meaning it could not consider Schmidt's mental impairment, if any, when determining whether he killed with premeditation and deliberation.

Finally, even if we were to determine there was some error, it is harmless in view of the jury's true finding on the special circumstance allegation that Schmidt killed J.B. by lying in wait. That finding alone designated the crime as one of first degree murder. " 'Lying in wait is the functional equivalent of proof of premeditation, deliberation, and intent to kill.' . . . Once a sufficient period of watching and waiting is established, together with the other elements of lying-in-wait murder, no further evidence of premeditation and deliberation is required in order to convict the defendant of first degree murder." (*People v. Sandoval* (2015) 62 Cal.4th 394, 416; see also *People v. Wright* (2015) 242 Cal.App.4th 1461, 1496 [showing of

lying in wait makes unnecessary separate proof of premeditation and deliberation].) The court included "intent to kill, as it relates to the special circumstance of lying in wait" as part of CALCRIM No. 3428 on the use of defendant's asserted mental impairment. We conclude any misdirection of the jury as to premeditation and deliberation would not have altered the verdict.

## C. *CALCRIM No. 625*

Schmidt contends the version of CALCRIM No. 625 given was incomplete and erroneous because it improperly limited the jury's consideration of voluntary intoxication evidence to the elements of intent, deliberation and premeditation, or whether he was unconscious when he acted. Citing *People v. Wiidanen* (2011) 201 Cal.App.4th 526, he maintains that based on this record, the voluntary intoxication evidence was also relevant to the jury's evaluation of the veracity and reliability of the incriminating statements he made during his police interview. Schmidt argues the error was prejudicial and compels reversal of his first degree murder conviction as well as the special circumstance finding because it "struck directly at the heart of [his] defense based on mental disease and defect." He maintains he presented a credible mental disease or defect defense, and points to evidence that he was an Iraq war veteran diagnosed with PTSD; his crime was nonsensical, suggesting mental illness; and the evidence of intent to kill was strong and consistent with his killing for the "thrill of it" or at "Agent Orange's" direction. According to Schmidt, had the jury been properly instructed on his mental disease defense, there is a reasonable probability it would have found that though he acted with the intent to kill, he did not do so with the requisite deliberation and premeditation necessary for first degree murder or the lying-in-wait

15

allegation. Schmidt argues the erroneous voluntary intoxication instruction compounded the prejudice due to the prosecution using his voluntary intoxication to undercut his defense by suggesting it was fabricated since he did not talk about Agent Orange when he was being interviewed by police while intoxicated.

For the reasons expressed above, we agree with the People that Schmidt forfeited the claim by failing to ask that the instruction be supplemented or augmented. (*People v. Buenrostro, supra*, 6 Cal.5th at p. 428; *People v. Covarrubias, supra*, 1 Cal.5th at pp. 901, 906, 911, 913; *People v. Jackson, supra*, 1 Cal.5th at p. 336.)

To forestall Schmidt's ineffective assistance of counsel claim, however, we will address the merits and assume the court erred by failing to sua sponte modify the voluntary intoxication instruction as Schmidt contends.[6] Schmidt argues we should assess prejudice as if the error deprived him of instructions on an applicable defense and apply the *Chapman* (*People v. Chapman* (1967) 386 U.S. 18) standard of prejudice for federal constitutional error. We do not see Schmidt's claims of incomplete jury instructions on the issues of mental defect and voluntary intoxication as the absence of jury instructions on a defense or as preventing Schmidt from presenting a defense. And the California Supreme Court has held that instructional error

_____

[6] The People concede that under *People v. Wiidanen, supra*, 201 Cal.App.4th at p. 533, intoxication has relevance to the question of awareness, familiarity, understanding, and the ability to recognize and comprehend. However, the law as to voluntary intoxication, section 29.4, subdivision (b), does not say voluntary intoxication is relevant to a defendant's veracity. (§ 29.4, subd. (b) ["Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought"].)

16

restricting a jury's consideration of voluntary intoxication amounts to state law error.  (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 187; *People v. Mendoza* (1998) 18 Cal.4th 1114, 1134-1135.)  Under the circumstances, we reverse only if we find a reasonable probability the error affected the verdict adversely to Schmidt.  (*Letner*, at p. 187.)

While Schmidt maintains the instructional errors struck at the heart of his mental deficiency defense, we have already concluded that the court properly instructed the jury as to that defense.  We need only address Schmidt's claim that the voluntary intoxication instruction "was used by the prosecution to undercut his [mental deficiency] defense at trial by suggesting it was fabricated because he did not say these same things about Agent Orange while he was intoxicated and being interviewed by police."  Schmidt refers to the prosecutor's closing arguments at pages 1287 to 1289, but in none of the closing remarks on those pages did the prosecutor refer to the voluntary intoxication instruction or Schmidt's intoxication at all.  Finally, in view of Schmidt's conduct after the killing, wiping down his vehicle and cleaning his clothing, as well as his concession to M.H. that the Agent Orange story was "total bullshit," Schmidt's mental deficiency defense was weak already.  On this record, Schmidt has not demonstrated prejudice.

As for the effect of voluntary intoxication on Schmidt's veracity or reliability of his statements to police, neither Schmidt nor his own defense expert testified or even suggested at trial that his intoxication impacted his statements to police.  As summarized above, Schmidt's defense medical expert explained that alcohol would suppress seizures and allow an alcoholic to become *more* functional.  Schmidt himself was asked about the truth of his statements to police and did not say they were influenced in any way by

17

alcohol.[7] Additionally, the jury heard M.H. testify about Schmidt confessing to killing J.B. consistent with what Schmidt told police. We cannot say on this record there is a reasonable probability the jury would have reached a verdict more favorable to Schmidt had the trial court instructed it to consider his intoxication on the veracity or reliability of his statements to police.

## II. *Parole Revocation Fine*

Schmidt contends his parole revocation fine must be stricken from his sentence because he was sentenced to life without the possibility of parole, for which such a fine is inapplicable. (*People v. Jenkins* (2006) 140 Cal.App.4th 805, 819.) The People concede the error and we agree; "a parole revocation fine is not applicable where there is no possibility of parole." (*People v. DeFrance* (2008) 167 Cal.App.4th 486, 505.)

---

[7] Schmidt gave the following testimony after being asked: "Do you recall telling [the detective] that you felt you needed a taste for blood?" [¶] [Schmidt]: Yes. Okay. [¶] [Defense counsel:] That you needed that thrill again; you had the edge? [¶] [Schmidt:] Yes. [¶] [Defense counsel:] Why did you say that? [¶] [Schmidt]: You know, I've been kicking myself for that for the last two and a half years. The worst thing to ever say to a prosecutor, I guess, or detective. But in my—in my head it didn't feel like this whole thing was real—it still doesn't feel real. And so I said the first thing that came to my head was wanted to taste blood again which, you know, you hear, like, in a Rambo movie or something. [¶] But, like, I can't say why I said that. It's not like there's an itch or a feeling like that in me. It's my own little world is happening. [¶] [Defense counsel:] Was there any truth to the fact that you were feeling the need to taste blood—[¶] . . . [¶] . . . or the urge to kill? [¶] [Schmidt:]—no because I've never had this before and—I would say no, there's not."

DISPOSITION

The matter is remanded and the trial court directed to strike the parole revocation fine imposed under section 1202.45 and forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


O'ROURKE, J.

WE CONCUR:


BENKE, Acting P. J.


IRION, J.

19