Filed 9/20/24  Friends of the River v. Sites Project Authority CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| FRIENDS OF THE RIVER et al., | C101361 |
| Plaintiffs and Appellants, | (Super. Ct. No. CV-2023-2626) |
| v. | |
| SITES PROJECT AUTHORITY et al., | |
| Defendants and Respondents. | |

The California Environmental Quality Act (CEQA; Pub. Resources Code,[1] § 21000 et seq.) requires environmental impact reports to properly inform the public of significant environmental impacts of certain projects compared against an environmental baseline and to present feasible alternatives to the project.  Respondents the Sites Project Authority and the Board of Directors of the Sites Project Authority (collectively the

---

[1]    All further section references are to the Public Resources Code unless otherwise specified.

1

Authority) certified an environmental impact report for a project to build a reservoir in Northern California capturing excess storm water (the project). Appellants Friends of the River, Center for Biological Diversity, California Sportfishing Protection Alliance, California Water Impact Network, Save California Salmon, and Sierra Club (collectively petitioners) filed a petition for writ of mandate challenging the Authority's certification of the project's environmental impact report. The superior court denied the writ. On appeal, petitioners challenge the Authority's certification arguing the environmental impact report's environmental baseline and list of alternatives are invalid under CEQA. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The Authority is the lead agency for the project that aims to "capture excess water from major storms and store the water until it is most needed during dry periods" by using "existing infrastructure to divert unregulated and unappropriated flow from the Sacramento River . . . and convey the water to a new offstream reservoir west of the community of Maxwell, California." The reservoir would also release water back into the Sacramento River system "to benefit local, state, and federal water use needs, including public water agencies, anadromous fish[2] species in the Sacramento River watershed, wildlife refuges and habitats, and the Yolo Bypass to help supply food for delta smelt." After issuing an initial draft environmental impact report in 2017 for the project and a revised environmental impact report in 2021, the Authority certified a final environmental impact report on November 17, 2023.

On December 19, 2023, petitioners filed a petition for writ of mandate with the trial court requesting it set aside the Authority's certification of the final environmental

_____

[2]     "Anadromous fish are fish that ascend rivers from the sea for breeding." (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 226, fn. 2.)

2

impact report. The petition also noted the project qualified for judicial streamlining under Senate Bill No. 149 (2023-2024 Reg. Sess.) (Stats. 2023, ch. 60, § 1). The trial court denied the petition on May 31, 2024, and the final judgment was filed on June 12, 2024.

Petitioners appeal.

DISCUSSION

CEQA requires lead agencies to prepare "an environmental impact report on any project which they propose to carry out or approve that may have a significant effect on the environment." (§ 21100, subd. (a).) "The [environmental impact report] is the primary means of achieving the Legislature's considered declaration that it is the policy of this state to 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.' [Citation.] The [environmental impact report] is therefore 'the heart of CEQA.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392.) "Under CEQA, 'a public agency is not required to favor environmental protection over other considerations, but it must disclose and carefully consider the environmental consequences of its actions, mitigate adverse environmental effects if feasible, explain the reasons for its actions, and afford the public and other affected agencies an opportunity to participate meaningfully in the environmental review process.' " (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 982.)

We review a challenge to an environmental impact report for an abuse of discretion. (§ 21168.5; *Laurel Heights Improvement Assn. v. Regents of University of California*, *supra*, 47 Cal.3d at p. 392.) Accordingly, we must " 'presume[] a public agency's decision to certify the [environmental impact report] is correct, thereby imposing on a party challenging it the burden of establishing otherwise.' [Citation.] . . . [¶] . . . Such review differs according to the type of error claimed. [Citation.] 'Whether an "agency has employed the correct procedures," is reviewed "de novo . . . ."

3

[Citation.]  But an "agency's substantive factual conclusions" are "accord[ed] greater deference." ' " (*Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184, 195.)  "Our role is to determine whether the challenged [environmental impact report] is sufficient as an information document, not whether its ultimate conclusions are correct." (*Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 486.)  And "we do not require technical perfection or scientific certainty:  ' " '[T]he courts have looked not for an exhaustive analysis but for adequacy, completeness and a good-faith effort at full disclosure.' " ' " (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 515.)

I

*The Environmental Impact Report's Environmental Baseline Is Not Invalid*

Petitioners first contend the final environmental impact report "fails to use an accurate environmental baseline" because it both relies on "withdrawn" biological opinions and does not consider the State Water Resources Control Board's (Board) future updates to the Bay-Delta water quality control plan.  We conclude neither of these fatally undermines the environmental impact report.

A

*Relevant Background*

In April 2021, the Authority's environmental planning and permitting manager wrote a memorandum explaining how the "baseline conditions for water supply and delivery in California have changed substantially in 2019[ to ]2020."  The United States Fish and Wildlife Service and National Marine Fisheries Service had issued new biological opinions[3] in 2019 (2019 biological opinions) for the federal water management

---

[3]     "Biological opinion" is defined in the federal Endangered Species Act as:  "[T]he document that states the opinion of the [United States Fish and Wildlife Service or the

4

programs covering the project, and "the State of California and a coalition of environmental groups" challenged the 2019 biological opinions in federal court. The memorandum noted this litigation created an "uncertainty over the regulatory regime that ultimately will govern" the project, but the Authority "is not at liberty to stop planning activities and wait for resolution of the current disputes." Despite this uncertainty, the Authority intended to use as an environmental baseline the "CalSim II 2020 Benchmark" (CalSim II) that incorporates the 2019 biological opinions. The memorandum recognized that, due to the ongoing litigation, it is possible the Authority will need to prepare additional analysis to assess changes during the planning and permitting process.

On March 11, 2022, and February 24, 2023, the United States District Court for the Eastern District of California imposed interim operations plans detailing certain policies for the federal water management programs covering the project and ordered a remand of the 2019 biological opinions "to their respective federal agencies without vacatur." The February 2023 order stated that interim operations plans expired on December 31, 2023.

The final environmental impact report certified in November 2023 largely incorporated the analysis from the April 2021 memorandum. The final report stated the Authority was using the CalSim II model to identify water system-related impacts, which "incorporates both [2019 biological opinions]." The final report acknowledged the 2019 biological opinions were subject to litigation and the federal court granted requests to adopt an interim operations plan "that is in place until the end of 2023." But the report stated, "[T]his recently issued interim plan is only temporary. Accordingly, the environmental baseline in this [environmental impact report] incorporates the [2019 biological opinions] . . . , which have not been vacated or invalidated. Further, the

National Marine Fisheries Service] as to whether or not the [f]ederal action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." (50 C.F.R. § 402.02 (2024).)

5

contents and requirements of the future biological opinions are currently unknown and are speculative at this time. At such time when new biological opinions are issued, the Authority and [the United State Bureau of Reclamation] will make a determination of what actions are required or warranted with respect to the [p]roject, including any further environmental review."

B

*Legal Standards*

The environmental impact report must include, among other details, "[a]ll significant effects on the environment of the proposed project." (§ 21100, subd. (b)(1).) To make the significant effects assessment, CEQA Guidelines require environmental impact reports to "include a description of the physical environmental conditions in the vicinity of the project" that "will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant." (Cal. Code Regs., tit. 14, § 15125, subd. (a); see Guidelines for the Implementation of the California Environmental Quality Act.[4]) "The purpose of this requirement is to give the public and decision makers the most accurate and understandable picture practically possible of the project's likely near-term and long-term impacts." (Guidelines, § 15125, subd. (a).)

"Neither CEQA nor the CEQA Guidelines mandates a uniform, inflexible rule for determination of the existing conditions baseline. Rather, an agency enjoys the discretion

---

[4]    References to the "Guidelines" are to the regulations for the implementation of CEQA codified in title 14, section 15000 et seq. of the California Code of Regulations, which have been developed by the Office of Planning and Research and adopted by the Secretary of the Natural Resources Agency. (§ 21083.) The Guidelines are statutorily mandated to provide "criteria for public agencies to follow in determining whether or not a proposed project may have a 'significant effect on the environment.' " (§ 21083, subd. (b).) "We give the Guidelines great weight in interpreting CEQA, except where they are clearly unauthorized or erroneous." (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 217, fn. 4.)

to decide, in the first instance, exactly how the existing physical conditions without the project can most realistically be measured, subject to review, as with all CEQA factual determinations, for support by substantial evidence." (*Communities for a Better Environment v. South Coast Air Quality Management District* (2010) 48 Cal.4th 310, 328 (*Communities for a Better Environment*).)

C

*The Baseline Is Not Invalid*

1

*No Error Established In Using The 2019 Biological Opinions*

Petitioners first assert the environmental baseline is deficient because it relies on the 2019 biological opinions. Central to this argument is the ongoing litigation in federal court over the 2019 biological opinions, which petitioners assert rendered the opinions "withdrawn" and inapplicable to the project. The Authority adamantly disagrees with this characterization of the lawsuit's outcome, arguing "[i]t is indisputable that the 2019 [b]iological [o]pinions were in effect and governing" during preparation of the revised draft environmental impact report and "[a]s of the publication of the [p]roject's [final environmental impact report], no new [b]iological [o]pinions had been issued." We understand this dispute to be a legal issue, whether the 2019 biological opinions' legal uncertainty necessarily rendered them incapable of establishing the environmental baseline. We will therefore review this issue de novo. (*Orange County Water Dist. v. MAG Aerospace Industries, Inc.* (2017) 12 Cal.App.5th 229, 240.)

We conclude petitioners have failed to carry their burden. Even if the 2019 biological opinions were withdrawn, vacated, or otherwise not in legal effect at the time the environmental analysis was commenced, petitioners present no argument or evidence these opinions did not reflect the current environmental conditions under CEQA. This is the key baseline analysis. CEQA requires adoption of a baseline reflecting "the physical environmental conditions in the vicinity of the project," "as they exist . . . *at the time*

7

*environmental analysis is commenced*." (Guidelines, § 15125, subd. (a), italics added.) This determination must be supported by substantial evidence, but petitioners provide no legal authority categorically disallowing an agency from considering an environmental opinion subject to ongoing litigation to form this substantial evidence. Instead, agencies may consider any evidence, even regulations that may be changing or have changed, as long as the agency's reasoning is supported by substantial evidence and effectively informs public discourse. (Cf. *John R. Lawson Rock & Oil, Inc. v. State Air Resources Bd.* (2018) 20 Cal.App.5th 77, 105-106 [concluding an agency had discretion to select appropriate regulations to measure current existing conditions even when those regulations were expected to change].)

It is possible the 2019 biological opinions no longer support a current condition determination. But to establish this, petitioners would need to provide evidence and argument on such topics as why the 2019 biological opinions are being challenged, the evidence supporting these challenges, the reasoning for the adoption of the interim plans, the differences between the interim plans and the 2019 biological opinions, and whether these differences exhibit a lack of substantial evidence in determining the current physical conditions for purposes of CEQA. None of that is before this court because petitioners' arguments assume legal uncertainty eliminates all value from the 2019 biological opinions to evaluate current physical conditions. For example, petitioners state they "agree that [the 2019 biological opinions] were not hypothetical or speculative for the approximately two years that they governed the [project]. But as soon as the federal court issued the first [i]nterim [o]perations [o]rder, they became irrelevant to the environmental baseline because they clearly did not represent historic conditions or conditions expected when the project becomes operational." Absent from petitioners' analysis is why and how the interim operations order immediately eliminated the utility of 2019 biological opinions for establishing the baseline.

Petitioners provide the federal court orders in the record. And the litigation does involve challenges to the 2019 biological opinions. But nowhere in the federal court orders are the 2019 biological opinions discussed in the context of CEQA baseline analysis. (See *Pacific Coast Federation of Fishermen's Associations v. Raimondo* (E.D.Cal., Mar. 11, 2022, Nos. 1:20-cv-00431-DAD-EPG & 1:20-cv-00426-DAD-EPG) 2022 U.S.Dist. LEXIS 44155, sub. opn. (E.D.Cal., Feb. 24, 2023, Nos. 1:20-cv-00431-JLT-EPG & 1:20-cv-00426-JLT-EPG) 2023 U.S.Dist. LEXIS 31120.) It would be inappropriate for us to sift through another court's analysis on our own to determine, based on evidence not before us and without argument from the parties, whether we believe the 2019 biological opinions can adequately address current physical conditions for the purposes of CEQA. Legal validity is likely relevant in determining the accuracy and appropriateness of relying on an opinion for a CEQA baseline analysis, especially when the opinions form the basis for the regulatory environment governing the project, as these opinions appear to do. But petitioners have not presented support for their underlying assumption this legal uncertainty is fatal to the integrity of such opinions in all circumstances, let alone under these specific circumstances.

Petitioners also do not present any compelling contrary option on which the Authority should have relied. Petitioners contend the 2019 biological opinions "have been remanded and the federal agencies *will* issue new biological opinions that *may* provide greater protection to threatened and endangered species." (Italics added.) But the Authority is not required to rely on *hypothetical plans that do not yet exist*. (Guidelines, § 15125, subd. (a)(3); *Communities for a Better Environment*, *supra*, 48 Cal.4th at p. 322 [environmental impact reports " 'must focus on impacts to the existing environment, not hypothetical situations' "].) Petitioners also point to the interim operations plan implemented by the parties in the federal litigation that they assert "certainly provides guidance." But this plan expired on December 31, 2023. This interim plan has the same legal uncertainty petitioners rely on to undermine the 2019

9

biological opinions.  Petitioners therefore ask this court to apply a double standard, which we will not do.

There is no disagreement uncertainty exists in which standards best reflect current conditions.  But the Authority had discretion, supported by substantial evidence, in determining the best way to inform the public about existing environmental conditions. (*Communities for a Better Environment*, *supra*, 48 Cal.4th at p. 328 ["an agency enjoys the discretion to decide, in the first instance, exactly how the existing physical conditions without the project can most realistically be measured"].)  And "we do not require technical perfection or scientific certainty."  (*Sierra Club v. County of Fresno*, *supra*, 6 Cal.5th at p. 515.)  The Authority explained in the final environmental impact report that the 2019 biological opinions still represented the best information of the current physical conditions.  The report also acknowledged the possibility the federal litigation's outcome would require a reassessment of the baseline, but noted relying on temporary reports produced within the litigation, such as the interim plans that expired in December 2023, would be "speculative."  This analysis properly informs the public of the legal uncertainty and the Authority's reasoning for still relying on the 2019 biological opinions.

We therefore conclude petitioners have not carried their burden to establish the 2019 biological opinions' legal uncertainty automatically invalidates the opinions' utility in establishing the environmental impact report's environmental baseline.

2

*No Error Established In Not Using Future*

*Bay-Delta Water Quality Control Plan Updates*

Petitioners also challenge the final environmental impact report's environmental baseline because it "fails to take into account the [Board's] process of updating the Bay-Delta [w]ater [q]uality [c]ontrol [p]lan."  The argument suffers from similar shortcomings as above.  Petitioners admit no update is currently in place but assert the Board

10

"*anticipates* adopting new water quality standards," and the final environmental impact report "excludes consideration of the *forthcoming* updates," even though these updates are "*reasonably* foreseeable." (Italics added.) But again, the Authority " 'must focus on impacts to the existing environment, not hypothetical situations.' " (*Communities for a Better Environment*, *supra*, 48 Cal.4th at p. 322; Guidelines, § 15125, subd. (a)(3).) Thus, as with the 2019 biological opinions, petitioners do not provide any countervailing evidence of standards currently in place undermining the Authority's environmental baseline.

## II

### *The Environmental Impact Report's Alternatives Are Not Invalid*

Petitioners' second challenge to the final environmental impact report is to the listed project alternatives. Petitioners contend, "[T]he range of alternatives is inadequate because the [environmental impact report] failed to consider *any* operational alternatives that would reduce or avoid potentially significant environmental impacts." Petitioners focus on alternatives having the same water diversion criteria, which, petitioners assert, is "when and how much water the Authority will divert from the Sacramento River system to fill the reservoir, and when and how much water is released from the reservoir. Yet different operational parameters would necessarily have different environmental consequences." We agree with the Authority this position is "contradicted by the record."

### A

### *Relevant Background*

The Authority identified five objectives for the project, which included: "improv[ing] water supply reliability and resiliency to meet" certain agricultural and municipal demands, "[p]rovid[ing] public benefits consistent with Proposition 1," improving the relevant federal water management program's flexibility in meeting "environmental and contractual water supply needs and improving cold-water pool

management in Shasta Lake to benefit anadromous fish," and "[p]rovid[ing] surface water to convey biomass from the floodplain to the Delta to enhance the Delta ecosystem for the benefit of pelagic fishes[5] in the north Delta."

Based on these objectives, the Authority developed five alternatives for the project in the initial draft environmental impact report the Authority released in August 2017. These alternatives had the same reservoir location but varied in the reservoir capacity, pumping pipeline schema, pumping infrastructure, and other details. The alternatives did share certain operational parameters such as diversion criteria, which is the minimum flow rate required at locations in the Sacramento River system before water can be diverted into the off-stream reservoir. In the draft environmental impact report, the diversion criterion at a location called Wilkins Slough was 5,000 cubic feet per second, meaning diversion to the project was permitted only if the flow at that site reached above that rate, along with meeting flow criteria at other sites.

In the fall of 2020, a group of non-profit organizations, including petitioner Friends of the River, wrote the Authority expressing concern about the diversion criteria used and the lack of alternatives presented. This group requested, along with other criteria, diversion criteria "of at least 15,000 [cubic feet per second] past all Sacramento River points of diversion for [the reservoir] . . . during the months of October to June to protect out-migrating juvenile salmonids." The Authority modeled the project with the group's diversion criteria and found the resulting releases from the reservoir under the proposed diversion criteria would "reduc[e] the overall [p]roject environmental benefits substantially and increas[e] the cost of the environmental benefits to a point that they would likely no longer result in a cost/benefit ratio sufficient to qualify for Proposition 1 funding. Due to the substantial increase in costs and the virtual elimination of the

---

5    "Pelagic fish are species that spend most of their life swimming in the water column, having little contact or dependency with the bottom."

environmental benefits of the [p]roject, this scenario was not considered for further analysis."

The 2021 revised draft environmental impact report listed three project alternatives all with diversion criteria at Wilkins Slough to be "8,000 [cubic feet per second] in April and May; 5,000 [cubic feet per second] all other times." The draft report noted all project alternatives "would have a significant impact on juvenile winter-run Chinook salmon downstream migration survival," so it developed "[m]itigation [m]easure FISH-2.1" to "reduce this significant impact by preventing [p]roject diversions from reducing Sacramento River flow below 10,700 [cubic feet per second] at Wilkins Slough during March, April, and May."

In January 2022, the Department of Fish and Wildlife (Department) and the Board wrote letters to the Authority expressing concern about the diversion criteria. The Department stated it "recommends the [final environmental impact report] include an [a]lternative with operational criteria that both meets [p]roposed [p]roject objectives and includes bypass flow criteria at Wilkins Slough of at least 10,712 [cubic feet per second] across the entire salmonid migration period of October to June . . . to minimize impacts to aquatic resources." The Department also stated, "Mitigation [m]easure FISH-2.1 should be conducted separately for winter-run Chinook salmon because the key input relies on a Wilkins Slough [b]ypass [f]low of 10,172 [*sic*] [cubic feet per second] from March through May after which most winter-run Chinook salmon have passed Wilkins Slough. Thus, winter-run Chinook salmon are not currently accounted for in this analysis." The Board stated in its letter: "The alternatives evaluated in the draft [environmental impact report] all have very similar operational constraints, with relatively minimal bypass flow criteria. Additional operational alternatives should be evaluated in order to provide a reasonable range of alternatives to inform the public and other decision makers of the benefits and impacts of the [p]roject."

13

The three alternatives in the final environmental impact report had the same diversion criteria, including diversion criteria at Wilkins Slough of 10,700 cubic feet per second from October 1 to June 14, and 5,000 cubic feet per second in September, with no diversions permitted from June 15 to August 31.  The report noted:  "Commenters expressed concern that [m]itigation [m]easure FISH-2.1 only included the months of March through May and that this would not encompass the full migration period of juvenile migrating salmonids.  In the [final environmental impact report], the [p]roject alternatives' operational criteria now include Wilkins Slough bypass flow criterion of 10,700 [cubic feet per second] from October 1 to June 14, thereby addressing concerns that the juvenile salmonid migration period [was] not covered by the criteria."

B

*Legal Standards*

"The core of an [environmental impact report] is the mitigation and alternatives sections."  (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 (*Goleta*).)  An environmental impact report must provide alternatives to the project and "public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects."  (§ 21002; see § 21061.)

"The process of selecting the alternatives to be included in the [environmental impact report] begins with the establishment of project objectives by the lead agency."  (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1163.)  An environmental impact report "shall describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project."  (Guidelines, § 15126.6, subd. (a).)  " 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors."  (§ 21061.1; see *Goleta, supra*, 52 Cal.3d at p. 565.)

14

The rule of reason ultimately governs. "There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason." (Guidelines, § 15126.6.) The rule of reason "requires the [environmental impact report] to set forth only those alternatives necessary to permit a reasoned choice" and to "examine in detail only the ones that the lead agency determines could feasibly attain most of the basic objectives of the project." (Guidelines, § 15126.6, subd. (f).) An environmental impact report does not have to consider alternatives "whose effect cannot be reasonably ascertained and whose implementation is remote and speculative." (Guidelines, § 15126.6, subd. (f)(3).) Thus, "CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an [environmental impact report]. Each case must be evaluated on its facts" (*Goleta*, *supra*, 52 Cal.3d at p. 566), "with 'the ultimate objective being whether a discussion of alternatives "fosters informed decision-making and informed public participation" ' " (*California Native Plant Society v. City of Santa Cruz*, *supra*, 177 Cal.App.4th at p. 992).

"Courts will defer to an agency's selection of alternatives unless the petitioners (1) demonstrate that the chosen alternatives are ' " 'manifestly unreasonable and . . . do not contribute to a reasonable range of alternatives,' " ' and (2) submit evidence showing the rejected alternative was both 'feasible' and 'adequate,' because it was capable of attaining most of the basic objectives of the project, taking into account site suitability, economic viability, availability of infrastructure, general plan consistency, and other relevant factors." (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 345.)

C

*The Alternatives Are Not Invalid*

We first must determine what range of alternatives CEQA requires in the environmental impact report. Petitioners argue: "CEQA requires that [a]n [environmental impact report] set forth the alternatives that were considered by the lead

15

agency and rejected as infeasible during the scoping process, and the reasons underlying the agency's determination." Petitioners cite *Goleta*, *supra*, 52 Cal.3d 553 for support, but *Goleta* does not support that assertion. Instead, our Supreme Court stated in *Goleta*, "[A]n [environmental impact report] must discuss and analyze *feasible* alternatives," " '[b]ut where potential alternatives are not discussed in detail in the [environmental impact report] because they are not feasible, the evidence of infeasibility need not be found within the [environmental impact report] itself. Rather a court may look at the administrative record as a whole to see whether an alternative deserved greater attention in the [environmental impact report].' " (*Id*. at p. 569.)

The Authority's consideration and rejection of alternative diversion criteria are in the administrative record. Here, two of the Authority's stated objectives for the project were providing Proposition 1 benefits and improving the ecosystem for fish. Throughout the process of preparing the environmental impact report drafts, the Authority received comments on the appropriate diversion criteria based on these objectives and adjusted the minimum diversion rate in response.

One comment came from the Department requesting a diversion criterion at Wilkins Slough above 10,712 cubic feet per second from October to June to minimize impacts on fish. The letter also noted the mitigation measure FISH-2.1 did not account for this entire period so it did not protect winter-run salmon. Based on this evidence from the agency charged with protection of California fish (Fish & G. Code, §§ 711.7, subd. (a), 1802), any diversion criterion permitting a flow below 10,712 cubic feet per second from October through June would fundamentally undermine one of the project's goals to protect fish. And the Authority increased the diversion rate to this limit during the October to June period for *all alternatives* in the final environmental impact report.[6]

---

[6] No party or document in the record suggests 10,700 cubic feet per second is materially different from 10,712 cubic feet per second.

Another comment came from non-profit organizations requesting an even higher diversion rate of 15,000 cubic feet per second from October to June at all points in the Sacramento River. The Authority modeled the project with this diversion rate and found it would result in a "substantial increase in costs and the virtual elimination of the environmental benefits" such that the project "would likely no longer result in a cost/benefit ratio sufficient to qualify for Proposition 1 funding." Thus, it would undermine project objectives.

The Authority was therefore left with a floor of 10,700 cubic feet per second for the diversion rate at Wilkins Slough. Anything below that would undermine the objective of protecting fish. And increasing this rate to the non-profits' proposed criteria would undermine multiple objectives. The Authority therefore impliedly found any rate other than 10,700 cubic feet per second was infeasible given the project's objectives.

There is no clear line for when an alternative becomes infeasible based on the number of objectives a potential alternative does or does not satisfy. The alternative analysis is instead left to the agency's discretion, guided by the rule of reason, to present feasible alternatives that foster informed public debate. (Guidelines, § 15126.6; *California Native Plant Society v. City of Santa Cruz*, *supra*, 177 Cal.App.4th at p. 992.) Given our above review of the administrative record, which included evidence for rejecting alternative diversion criteria that undermined project objectives, we cannot say the Authority's decision to limit the alternatives to the same diversion criteria was manifestly unreasonable nor that it created an unreasonable reasonable range of alternatives. (*South of Market Community Action Network v. City and County of San Francisco*, *supra*, 33 Cal.App.5th at p. 345.)

Petitioners also have not presented evidence of feasible or adequate alternatives not included in the final environmental impact report. Petitioners argue the Authority should have provided more alternative diversion flows in the final environmental impact report, presumably between 10,700 and 15,000 cubic feet per second. But petitioners do

17

not argue any rate above 10,700 and below 15,000 cubic feet per second would have been feasible given the project's objectives, nor do they present any evidence to support such a conclusion. Instead, petitioners attempt to put their burden on the Authority by contending, "A lead agency cannot defend an [environmental impact report] that does not include a reasonable range of alternatives with the argument that the public did not identify alternatives." It is true that "numerous CEQA provisions require that an [environmental impact report] adequately describe feasible alternatives," and that "[n]owhere in CEQA . . . is there a provision that this duty is conditional on a project opponent coming forward with a documented alternative." (*Laurel Heights Improvement Assn. v. Regents of University of California*, *supra*, 47 Cal.3d at p. 406.) But we have found the Authority's range of alternatives were not manifestly unreasonable and it is petitioners' burden to establish this range does not include feasible alternatives. (*California Native Plant Society v. City of Santa Cruz*, *supra*, 177 Cal.App.4th at p. 987 ["it is appellants' burden to demonstrate that the alternatives analysis is deficient"].) Otherwise, anyone could successfully challenge an environmental impact report simply by asserting there needs to be more alternatives even if the assertion is wholly baseless.

Without argument or evidence to the contrary, we must presume the Authority found infeasible increasing the rate above 10,700 cubic feet per second. Petitioners' failure to provide support for a feasible alternative diversion criteria other than what was included in the final environmental impact report's alternatives is fatal to their challenge.

Petitioners' reliance on the Board's letter requesting additional alternatives does not change this analysis. The Board did not assert the 10,700 cubic feet per second level was unreasonable, nor did it request the Authority to provide infeasible alternatives. Instead, it asked the Authority to provide a "reasonable range of alternatives." The Authority did as requested by the Board. Thus, neither the Board's letter nor petitioners on appeal establish the diversion criteria used in the final environmental impact report's alternatives were unreasonable or that there were other feasible diversion criteria.

18

We therefore conclude the environmental impact report is not invalid because all the alternatives shared diversion criteria.

DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1)-(2).)


/s/_____
ROBIE, Acting P. J.


We concur:


/s/_____
MESIWALA, J.


/s/_____
WISEMAN, J.*

_____

\*     Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.